I. Charles BAKER, Petitioner-Appellant,

v.

Thomas S. EISENSTADT, Sheriff of Suffolk County, Respondent-Appellee.

No. 71–1399.

United States Court of Appeals,
First Circuit.

Heard Jan. 5, 1972.

Decided Feb. 23, 1972.

Kevin M. Keating, Boston, Mass., with whom Monroe L. Inker, Crane, Inker & Oteri, and Charlotte Anne Perretta, Boston, Mass., were on brief, for appellant.

Walter H. Mayo, III, Asst. Atty. Gen., with whom Robert H. Quinn, Atty. Gen., James P. Kiernan, Terence P. O'Malley, Asst. Attys. Gen., and Danielle deBenedictus, Deputy Asst. Atty. Gen., were on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

Appellant, now in confinement under sentences for contempt of the Massachusetts Supreme Judicial Court, appeals the denial of his petition for habeas corpus and the dismissal of his complaint by the district court.

## I. The Facts

During the summer and fall of 1971, an investigation into the alleged misconduct of two judges of the Massachusetts Superior Court took place, part of which involved appellant's being interviewed, first, by Commonwealth investigators, and, second, by the Chief Justice of the Superior Court. Subsequently, the Supreme Judicial Court (hereinafter "Court") appointed special counsel who on October 4, 1971, presented an information [1] based on statements made by one Michael Raymond and others. The charges were summarized by the Court in its final opinion disposing of the matter as follows:

"In essence, Raymond stated that in 1962 he made payments to I. Charles Baker [appellant], a surety bail bondsman, upon Baker's representation that he could insure a favorable judicial result in Raymond's cases. Baker further stated, according to Raymond; that the arrangement for disposition of his matters was to be made through Judge DeSaulnier. From June of 1962 until the final disposition, Raymond

---

1. While two informations were filed, we are concerned here with only one.

was represented by Mr. Richard G. Crotty of Worcester, who was an intimate social friend of Judge DeSaulnier. Raymond's cases came before Judge Vincent R. Brogna in September, 1962. After several continuances, and after a partial restitution agreement had been reached with the victims of Raymond's larcenies, Raymond was given a suspended sentence and placed on probation. Following his final court appearance on September 28, Raymond and Baker met Judge DeSaulnier in a public place known as the Darbury Room. Raymond's matter was referred to, and Judge De-Saulnier expressed his pleasure in 'doing business' with Raymond." In the Matter of DeSaulnier and another, 1972 Mass.Adv.Sh. 65, 66, 279 N.E.2d 296.

On October 5, 1971, the day after the information was presented charging judicial misconduct, appellant and his brother, both licensed bail bondsmen, were indicted by the Middlesex County Grand Jury for larceny, the counts covering the period from November 20, 1967, to July 31, 1971, and for conspiracy to commit larceny, beginning in 1968.

Appellant, subpoenaed to testify at a hearing to be held on November 15, 1971, inquiring into the charges of judicial misconduct, moved to quash the subpoena, asserting that his Fourth, Fifth, and Fourteenth Amendment rights would be violated were he to be compelled to testify. In the course of considerable subsequent negotiation, amendments to the Commonwealth's original grant of immunity were prepared in an attempt to satisfy appellant's Fifth Amendment claim. A written stipulation, offered by the Middlesex County District Attorney, and assented to by the Massachusetts Attorney General, reached its final form on November 29, as reproduced in the margin.[2] At the same time the Court issued its "Finding and Rulings", 1971 Mass.Adv.Sh. 1689, 276 N.E.2d 278, denying appellant's claim of privilege "with respect to any examination or cross-examination concerning events prior to January 1, 1965, subject to [appellant's] establishing by counsel that there is, as to any particular question, a significant risk of incrimination not hitherto brought to the court's attention" *Id.* at 1693, 276 N.E.2d at 281.

Appellant, as will be more fully detailed later, refused to testify upon being recalled to the stand the same day. Forty-five substantive questions were asked, appellant refusing to answer each and being held in contempt for forty-three refusals. He was sentenced to five months imprisonment for each of twelve refusals, the sentences to run concurrently, with disposition reserved as to the remaining contempts.

Appellant immediately sought habeas corpus relief in the district court and also admission to bail. Upon denial of the latter motion, he appealed to us. Being then persuaded that the Commonwealth's stipulation met even the rigorous standard of transactional immunity in all material respects, we saw no more than speculative merit in appellant's ob-

2. "The Commonwealth will not prosecute any indictment returned against I. Charles Baker charging conspiracy or larceny prior to January 1, 1965.

"In prosecuting any indictment charging conspiracy or larceny subsequent to January 1, 1965, the Commonwealth will not introduce as evidence any conduct or statements of I. Charles Baker engaged in or made prior to that date.

"The Commonwealth will not introduce in any criminal proceeding any testimony given by I. Charles Baker before the Supreme Judicial Court or any facts learned as a consequence of such testimony, except in any prosecution for perjury based upon the testimony by I. Charles Baker before the Supreme Judicial Court in this proceeding. The Commonwealth will not prosecute I. Charles Baker for perjury, if any, committed in his sworn testimony before Chief Justice McLaughlin of the Superior Court on August 25, 1971". 1971 Mass.Adv.Sh. 1695 (italics omitted).

jections and affirmed the denial of bail on December 1, 1971.

Later the same day, appellant was again brought before the Court. Counsel for appellant, though speaking "in mitigation of any punishment for contempt", argued that the contempt was civil and that appellant could purge himself at any time. The Court noted that the hearing had not ended, that appellant was at liberty to testify, but referred to counsel's suggestion that appellant could purge himself as "your words, not mine". Previously, the Court had been similarly non-committal when counsel had suggested that the contempt was civil. Appellant did not offer to testify. Sentence was then pronounced on twenty-three of the remaining thirty-one judgments of contempt, the sentences being for six months each, divided into four groups, the sentence for each group to begin "on and after" that for the prior group. The aggregate time to be served is twenty-nine months.

Appellant asserts first that no contempt was committed, since the Commonwealth's stipulation did not grant immunity coextensive with the Fifth Amendment. Secondly, he contends that if any contempt was committed, the sanction imposed by the court was coercive, the sentence being civil and expiring with the termination of the proceeding. Thirdly, if indeed the contempt judgments were criminal, he asserts that error was committed in resorting to summary punishment, without notice and hearing. Finally, he urges that the twenty-nine month aggregate sentence, being multiple punishment for a single contempt, places him in double jeopardy, constitutes cruel and unusual punishment, and violates his right to trial by jury.

## II. The Grant of Immunity

In our earlier decision denying bail we saw no substantial possibility that appellant could successfully challenge the efficacy of the Commonwealth's grant of immunity. We have since received no additional indication from appellant enlightening us as to how, if he had testified, he would have incriminated himself. The testimony was limited by order of the Court, both as to direct and cross-examination, to events prior to January 1, 1965. The statute of limitations has run on all crimes committed before that date, except such crimes as murder or treason which are in no way suggested by or related to the Court's proceeding. In the unlikely event that questions threatened to trench on any such area, the privilege could be asserted, under the Court's specific reservation. Moreover, no testimony or fruits thereof would be introduced in *any* criminal proceeding against appellant.

██ Despite the clear wording of the stipulation, appellant disputes the latter point. We observe that the danger of distinguishing tainted fruits from independently derived sources is in this case exceedingly remote, both because of the time period and subject matter covered by the proferred questions and the Court's order, and because, presumably, appellant's prior responses to the Chief Justice of the Superior Court would have furnished any leads, if leads existed. To speculate, as to new leads, that the Court would permit direct examination to transcend the boundaries it defined would be to assault its integrity. And, while the determination of relevance in fixing the scope of cross-examination is within the sound discretion of the court, there are limits, including particularly the substantial rights of a party, Commonwealth v. Granito, 326 Mass. 494, 496, 95 N.E.2d 539 (1950), and, in this case, confinement to events prior to 1965.[3] Finally, the stipulation protects appellant from any prosecution for prior perjury which his testimony might otherwise justify.

 The most expansive view of a constitutionally adequate grant of immunity is that it must give the witness protection from exposure to future crimi-

---

3. This provision of the Court's order disposes of appellant's concern that he might be questioned as to recent events if such would have a bearing on the issue of his credibility.

nal proceedings "as fully and extensively as he would be secured by availing himself of the privilege accorded by the constitution." In re Emery's Case, 107 Mass. 172, 185 (1871). Had appellant not been granted immunity and had he chosen to remain silent as to events prior to 1965, he would not thereby have had a better chance of escaping prosecution under the indictment for larceny and conspiracy allegedly occurring in 1968 and the years following. The two sets of events noted were largely independent of each other and evidence related to one would have had little relevance in any prosecution for the other. What appellant sought in return for his testimony was to be put in a better position than if he had remained silent as to events prior to 1965. He wished, as his counsel acknowledged, a blanket immunity from the most recent prosecution even though it related to wholly separate and subsequent transactions not implicated in the testimony sought to be elicited by the grant of immunity. Since by order of the court, the questioning was to be confined to events prior to 1965, since the statute of limitation had run on all conceivably relevant crimes committed during that period, since no testimony or fruits could be introduced in any criminal proceeding, and since no prosecution for prior perjury was to be permitted, the formula of Counselman v. Hitchcock, 142 U.S. 547, 586, 12 S.Ct. 195, 206, 35 L.Ed. 1110 (1892) ("absolute immunity against future prosecution for the offense to which the question relates") was satisfied. We conclude therefore that the Court succeeded in its painstaking effort to provide protection fully equal to the risk of incrimination involved in compelling appellant's testimony.

### III. Civil Versus Criminal Contempt

Appellant's contention that his incarceration is for civil contempt proceeds primarily from the assumption that it could not be for criminal contempt, since the adjudication was made summarily, without due process safeguards. We consider his attack on the Court's summary power to hold a witness in criminal contempt later. Suffice it to state here merely our conclusion that appellant's contention is without merit—not because of the label which the Court subsequently affixed, but because the essential ingredient of a sanction for civil contempt was lacking, that is, the condition that the contemnor be released if he were willing to testify. Shillitani v. United States, 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966).[4] While the Court indicated that appellant was at liberty to testify, there is no suggestion that its imposition of a determinate sentence was conditional or that appellant could have purged himself. That the Court might well have modified sentence had appellant testified would have been in accord with common practice of giving some weight in determining the length of sentence to an act in mitigation. Groppi v. Leslie, 404 U.S. 496, 92 S.Ct. 582, 30 L.Ed.2d 632 (1972).

The suggestion that Shillitani requires that the Court impose civil sanctions as a precondition to the imposition of a criminal penalty overstates the holding in that case. The Shillitani requirement, even for federal courts, is merely that a judge "consider the feasibility" of civil contempt. 384 U.S. at 371 n. 9, 86 S.Ct. 1531, 16 L.Ed.2d 622. Even if this requirement applies to state courts, but see United States v. DiMauro, 441 F.2d 428, 435 (8th Cir. 1971), the recurrent

4. Appellant also argues that a refusal to testify cannot be a basis for criminal contempt, citing the dictum in Shillitani, 384 U.S. at 368, 86 S.Ct. 1531, 16 L.Ed. 2d 622, which was borrowed from the distinction in Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911), "between refusing to do an act commanded . . . and doing an act forbidden . . . [which] generally, if not universally, affords a test by which to determine the character of the punishment." Id. at 443, 31 S.Ct. at 499. Whatever application this distinction may have elsewhere, it has none to refusal to testify. See, e. g., Yates v. United States, 355 U.S. 66, 78 S.Ct. 128, 2 L.Ed.2d 95 (1957).

parrying here between the Court and counsel as to whether the contempt was civil or criminal is evidence that the issue was considered.

### IV. Propriety of Summary Adjudication

■ Appellant argues, alternatively, that the Court was without power summarily to adjudicate him guilty of criminal contempt. Rule 42(a), F.R.Crim.P., provides in part that "A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court." This rule reflects the common law, Bloom v. Illinois, 391 U.S. 194, 209, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968). Although we have held that refusal to answer questions before a grand jury cannot be punished summarily, we have recognized that refusal to answer in the "actual presence" of the court can be so dealt with. Carlson v. United States, 209 F.2d 209, 216 (1st Cir. 1954). We are mindful that in United States v. Pace, 371 F.2d 810 (2d Cir. 1967), the court extended the holding in Harris v. United States, 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965), proscribing summary procedure for one refusing to testify before a grand jury, to refusals to testify in court. Not only, however, was *Pace* apparently based on the supervisory powers of a federal appellate court, Nelson v. Holzman, 300 F. Supp. 201, 202 (D.Or.1968), but we draw from the recent opinion of the Supreme Court in Groppi v. Leslie, *supra*, a clear intimation that no exception to summary contempt procedure for in-court procedure is recognized for orderly refusals to testify.

In *Groppi*, the Supreme Court, through Chief Justice Burger, said:

"Where a court acts immediately to punish for contemptuous conduct committed under its eye, the contemnor is present of course. There is then no question of identity, nor is hearing in a formal sense necessary because the judge has personally seen the offense and is acting on the basis of his own observations.[8] Moreover, in such a sit-

"8. The Court has been careful to limit strictly the exercise of the summary contempt power to cases in which it was clear that all of the elements of misconduct were personally observed by the judge. See Johnson v. Mississippi, 403 U.S. 212, 214–215 [91 S.Ct. 1778, 1779–1780, 29 L.Ed.2d 423] (1971); In re Oliver, 333 U.S. 257, 275–276 [68 S.Ct. 499, 508–509, 92 L.Ed. 682] (1948)."

uation, the contemnor has normally been given an opportunity to speak in his own behalf in the nature of a right of allocution. See Levine v. United States, 362 U.S. 610, 613–614 [80 S.Ct. 1038, 1041–1042, 4 L.Ed.2d 989] (1960); Brown v. United States, 359 U.S. 41, 52 [79 S.Ct. 539, 547, 3 L.Ed. 2d 609] (1959); United States v. Sacher, 182 F.2d 416, 418 (CA2 1950), aff'd, 343 U.S. 1 [72 S.Ct. 451, 96 L. Ed. 717] (1952)."

What we discern in this statement is not only that it is categorical, and that all of the criteria fit mere refusals to testify fully as much as violent conduct, but that the citations of *Levine, Brown,* and *In re Oliver*—all three cases involving only refusals to testify—suggest that non-violent, even polite, recalcitrance can be subject to summary procedure.[5]

■ We therefore hold that the Court acted within its power in summarily adjudicating appellant guilty of criminal contempt. While this holding disposes of appellant's argument that he was entitled to notice and hearing, In re Oliver, 333 U.S. 257, 275, 68 S.Ct. 499, 92 L.Ed. 682 (1948), we must observe that, as both our prior and subsequent discussions reveal in some detail, appellant had lengthy notice of the seriousness of his affront to the Court and of its resistance to any suggestion that it deem that af-

5. We would also note the Supreme Court's reference to the present practice of Parliament, which specifies as a basis for summary contempt procedure "where a witness . . . refuses to answer . . . ." 404 U.S. at 507, 92 S.Ct. at 588, 30 L.Ed.2d 448 n. 12.

front a civil contempt. He also was in effect given a substantial hearing in which his counsel elaborated at length his reasons in persisting in what both the Court and we have held was an unfounded claim of privilege.

### V. Validity of Multiple Penalties

A more troublesome issue relates to the Court's finding petitioner in contempt for his refusal to answer each of the forty-five questions put to him, dividing thirty-five of the offenses into five groups, imposing concurrent sentences for each group, and providing that the five group sentences run consecutively, so that the entire duration of time to be served in jail is twenty-nine months. Petitioner argues that this disposition denied him his right to a jury trial, placed him in double jeopardy, and subjected him to cruel and unusual punishment.

■ The Court recognized the requirement of Bloom v. Illinois, *supra* at 210, 88 S.Ct. 1477, 20 L.Ed.2d 522, that criminal contempts be treated like other crimes insofar as right to jury trial is concerned, and the subsequent holding of Baldwin v. New York, 399 U.S. 66, 69, 90 S.Ct. 1886, 26 L.Ed.2d 437 (1970), that no offense can be deemed "petty" and therefore triable without a jury where more than six months imprisonment is authorized, or, in the case of contempts, imposed, *cf.* Cheff v. Schnackenberg, 384 U.S. 373, 86 S.Ct. 1523, 16 L. Ed.2d 629 (1966), *Bloom, supra* at 211, 88 S.Ct. 1477, 20 L.Ed.2d 522. But unlike *Bloom*, the Court here reasoned that appellant committed not one but a series of distinct contempts, no one of which merited more than a penalty of six months.[6] Moreover, the Court held that *Bloom's* requirement did not apply to the kind of contempt committed here —an orderly, though contumacious, re-

fusal in the courtroom to answer questions, there being no genuine dispute as to the facts. In the Matter of DeSaulnier and another, 1971 Mass.Adv.Sh. 1817, 1822–1823, 279 N.E.2d 287.

In elaborating on its conclusion that multiple offenses had been committed, the Court addressed two issues: whether the questions related to different facts and subject matter permitting multiple penalties and whether petitioner had in his initial response sufficiently established an area of refusal covering all the questions so that only a single contempt was committed. As to the first issue, the Court noted that each question sought to elicit new facts, and that, for sentencing purposes, the questions had been divided into "broader subjects of inquiry". As to the second issue, the Court held that petitioner never carved out an area of refusal as did the witness in Yates v. United States, 355 U.S. 66, 71, 73, 78 S. Ct. 128, 2 L.Ed.2d 95 (1957), and in People v. Riela, 7 N.Y.2d 571, 576–578, 200 N.Y.S.2d 43, 166 N.E.2d 840 (Ct. App.1960), but, as in People v. Saperstein, 2 N.Y.2d 210, 159 N.Y.S.2d 160, 140 N.E.2d 252 (Ct.App.1957), allowed the questioner reasonably to suppose that he might answer one or more subsequent questions. The Court concluded its opinion by acknowledging its awareness of possible constitutional limits on consecutive sentences, which had led it consciously to avoid an "excessive" aggregate.

■ ■ The law, federal and state, applicable to penalizing the kind of criminal contempt which consists of an unjustifiable reliance on the Fifth Amendment in refusing to answer questions in court is more harmonious in result than in rationale. It seems to be generally recognized that the issue is distinct from whether the refusals to answer could be made the subject of separate counts

---

6. Counsel for respondent (petitioner's custodian) would have us regard this ruling as unreviewable "for [the Court's] conclusion is not dependent upon the application of any principle of the Federal Constitution." The answer, of course, is that the Fifth Amendment guarantee against

double jeopardy, is enforceable against the States through the Fourteenth Amendment, and "protects against multiple punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969).

in an indictment.[7] Beyond this, as the authorities cited, *infra,* indicate, most courts have concluded that separate refusals to answer questions in the same proceeding, prior to punishment,[8] particularly when the refusals are based on the privilege against self-incrimination,[9] cannot be the subjects of multiple contempt penalties. *See, e. g.,* Annotation, 2 L.Ed.2d 1594, 1595.

■ The rationale of the decided cases is most often descriptive of the result reached rather than of prescriptive value for future cases. There is, of course, as we have noted, recognition of the inherent power of a court to punish unjustified refusals to testify in the courtroom by summary criminal contempt procedures. There is corresponding recognition that such summary power must be used with restraint. Even though restraint may be seen to limit a court's self-protective ability, such is required by the protections to be accorded individuals. Bloom v. Illinois, *supra* at 201–208, 88 S.Ct. 1477, 20 L.Ed.2d 522. Courts are also wary lest prosecutors, by their sheer ingenuity in conceiving and stamina in asking multiple questions calling for slightly different answers, be able to proliferate offenses. Yates v. United States, *supra* at 73, 78 S.Ct. 128, 2 L.Ed.2d 95; People v. Riela, 7 N.Y.2d 571, 200 N.Y.S.2d 43, 166 N.E.2d 840, 843 (Ct.App.1960); People ex rel. Amarante v. McDonnell, 100 N.Y.S.2d 463, 467 (Sup.Ct.1950). These observations are expressions of general policy and fall short of providing a legal litmus capable of deciding concrete cases.

Not uncommonly, courts have based their proscription of multiple penalties on their conclusion that refusal to answer a series of questions addressed to the same subject can amount only to a single offense. Maxwell v. Rives, 11 Nev. 213, 221 (1876) [". . . the mere refusal of a witness to testify on [sic] the same trial on the same issue cannot be deemed more than one contempt . . ."]; United States v. Yukio Abe, 95 F.Supp. 991, 992 (D.Hawaii 1950 [". . . as the questions appear to be directed all to one subject of inquiry and the answers were simultaneous during the proceedings, and continuous acts, the indictments therefore charge only one alleged offense"]; United States v. Emspak, 95 F.Supp. 1012, 1016 (D.D.C.1951) ["one single line of inquiry which was the specific phase of inquiry then being considered"]; Fawick Airflex Co. v. United Electrical, Radio & Machine Workers of America, 153 Ohio St. 589, 92 N.E.2d 431, 436, appeal dismissed, 154 Ohio St. 206, 93 N.E. 2d 480 [refusals "a single contempt, for the reason that they all had to do with the same subject matter"]; State v. Arnold, 123 N.E.2d 473 (Ohio C.P.1954). *But see* People v. Epps, 32 A.D.2d 865, 299 N.Y.S.2d 878.

While such a conclusory formulation as "single subject" or "single line of inquiry", or "same subject matter" may be sufficient to describe the disposition of cases in which a prosecutor has simply reframed in various forms a question addressed to whether the witness was a Communist, it is less helpful when different but additionally relevant and interconnected facts are sought to be elicited. The concept of a "single subject" is frustratingly open-ended, there being infinite ways of categorizing information in terms of time, place, incident,

---

7. United States v. Orman, 207 F.2d 148 (3d Cir. 1953); United States v. Kamin, 135 F.Supp. 382 (D.Mass.1955); United States v. Emspak, 95 F.Supp. 1012 (D.D.C.1951); United States v. Yukio Abe, 95 F.Supp. 991 (D.Hawaii 1950); People ex rel. Amarante v. McDonnell, 100 N.Y.S.2d 463 (Sup.Ct.1950); 94 A.L.R.2d 1246, 1247–1248; 2 L.Ed.2d 95.

8. A different situation exists when a witness is once punished for his refusal and is then recalled and asked the same or similar questions. Cases are collected in 94 A.L.R.2d 1246, 1254 ff.

9. When refusals are based on other reasons than the privilege, different conclusions and analyses may be applicable. *See, e. g.,* People v. Saperstein, 2 N.Y.2d 210, 159 N.Y.S.2d 160, 140 N.E.2d 252, cert. denied, 353 U.S. 946, 77 S.Ct. 825, 1 L. Ed.2d 856 (1957), where the witness relied on failure of memory to refuse to talk about five separate telephone conversations.

transaction, people, etc. Moreover, the use of such phrases as "single subject" as the basis for defining a contumacious refusal to testify involves the invocation of a wooden rubric devoid of any relation to policy.

We gain more guidance by noting, first, the precise nature of the contempt involved in this kind of case. Refusal to testify here is made contemptuous for no other reason than that the Fifth Amendment does not justify it, coextensive immunity having been offered as a substitute. The contempt lies in asserting the privilege against self-incrimination as to sought-for testimony which, because of the Court-approved stipulation of the Commonwealth, would not incriminate. With this perspective, three cases seem to us particularly helpful: United States v. Costello, 198 F.2d 200 (2d Cir.), cert. denied, 344 U.S. 874, 73 S.Ct. 166, 97 L.Ed. 677, reh'g denied, 344 U.S. 900, 73 S.Ct. 274, 97 L.Ed. 696 (1952); Yates v. United States, *supra*; and People v. Riela, *supra*.

In *Costello*, the witness, while not relying on the privilege against self-incrimination, made it clear that because he was not feeling well he would not answer any questions on a particular day. The court, through Augustus Hand, J., said:

> "But when the defendant made his position clear, the Committee could not multiply the contempt, and the punishment, by continuing to ask him questions each time eliciting the same answer: his refusal to give *any* testimony. In other words, the contempt was total when he stated that he would not testify, and the refusals thereafter to answer specific questions can not be considered as anything more than expressions of his intention to adhere to his earlier statement and as such were not separately punishable. [citations omitted]" 198 F.2d at 204.

In *Yates* the witness had not made an initial blanket refusal to testify, but on cross-examination had refused to identify a number of persons as Communists, giving as her reason that she did not want them to suffer harassment or be hurt. The Court held that only one contempt had been committed, since the witness had drawn "the lines of refusal [though] in less sweeping fashion [than by a flat refusal to answer any questions] by declining to answer questions within a generally defined area of interrogation. . . ." 355 U.S. at 73, 78 S.Ct. at 133, 2 L.Ed.2d 95. She had "carved out an area of refusal", *id.*, within which the prosecutor could not multiply contempts.

In *Riela* the witness refused at the outset of inquiry to answer any questions relating to the "Apalachin meeting" of supposed gangsters, and subsequently declined to answer seventeen questions on the same subject. While this might be said to be a "carving out" of an area of refusal, it was this meeting which was the grand jury's entire "target of investigation", 200 N.Y.S.2d 43, 166 N.E.2d at 842. The court, through Fuld, J., deemed irrelevant the fact that the questions asked were by no means the same and called for different answers, adding:

> "What is of significance is that it was apparent from the very start of his interrogation that Riela, relying upon the privilege, would decline to answer any question bearing on the 'Alalachin meeting', and that the questions, different though they were from one another, all related to that one subject. This being so, he is guilty of the single contempt of refusing to give testimony concerning the Apalachin gathering, rather than 17 contempts for refusal to answer individual questions about it. [citations omitted]" 200 N.Y.S.2d at 46, 166 N.E.2d at 842–843.

The court addressed not only the effect of an initial refusal to answer but the pressure on a witness to avoid waiver of a privilege once asserted: "Riela, under existing law, may well have been under the necessity, once he asserted the privilege, of repeating the claim as to each and every question asked him, lest an answer to any one

be deemed to effect a complete waiver of the privilege. [citations omitted]" *Id.*, 200 N.Y.S.2d at 46, at 843. In other words, the scope of the waiver was also seen as a means of defining a discrete offense. Repeated refusals to answer questions, when the refusals are based on the privilege against self-incrimination, may not only be reasonably expected by the prosecutor from the notice given initially by the witness; they may also be reasonably expected, if the law of the jurisdiction deems any one answer in the chain of questioning a waiver of the privilege as to subsequent questions.

### A. Notice

We examine first the question whether petitioner adequately gave timely and unambiguous notice that he would claim his privilege against self-incrimination as to all questions that might be put to him. Unlike most other cases that have come to our attention, resolution of this issue in the present case requires the setting out of a considerable chronology of events related to the claim of privilege. On or about October 29, 1971, petitioner was served with a subpoena to appear with records before the Court on November 15. On or about the latter date, petitioner moved to quash the subpoena, asserting his Fifth Amendment rights. Three days later, on November 18, the fourth day of the Court's hearing, petitioner was called to the stand. His counsel said, "I should like to once again ask the Court not to put Mr. Baker on the witness stand. I can assure the Court that insofar as he is able and permitted, he will plead the 4th and 5th Amendment in answer to various questions." On the next day, Special Counsel read to petitioner all the questions which had been put to him earlier by the Chief Justice of the Superior Court— some 224 in number. When the Court reconvened on November 22, the petitioner, asked if he intended to answer questions put to him, replied, "Sir, my answer is No. I am relying on the Fourth and Fifth Amendments of the Constitution of the United States because of the indictments now pending against me; I respectfully decline to an-

swer." Petitioner was pressed with the further question: "And that goes to any of those questions?" He answered, "Yes, sir."

Thereafter, as we have noted, came the efforts to devise a stipulation, binding on the Commonwealth, which would effectively protect petitioner against prosecution directly or indirectly based on the testimony he would give. Finally, after three amendments, the stipulation achieved its present form on November 29. Counsel for petitioner, however, made it clear that he did not accept it. Petitioner was again called to the stand, was asked the first question, "Now, directing your attention, Mr. Baker, to the year 1961, did you at some time in the fall of that year meet a man named Michael Raymond?", and refused to answer, using virtually the same words in invoking the Fourth and Fifth Amendments he had used nine days earlier. Special counsel then asked, "Mr. Baker, are you going to refuse to answer any and all questions I put to you, which questions I represent to you will be confined by their terms to the years 1961 and 1962?" Petitioner again replied, "Relying on the Fourth and Fifth Amendments to the Constitution of the United States, I respectfully decline to answer." Special counsel then said, "In view of the failure of the witness to answer the first question and in failing to answer even the second question, perhaps I should ask the Court if you wish me to continue my examination, question by question." The Court stated, "The Court feels special counsel should proceed to interrogate this witness." Thereupon, forty-three more questions were asked, each receiving the same ritual reply.

The Court felt it "significant" that petitioner declined to answer when asked whether he was going to refuse to answer any and all questions. It deemed irrelevant, however, any positions taken by petitioner prior to the stipulation. And it held, apparently likening this case to People v. Saperstein, *supra*, that petitioner had not carved out "an area of refusal" within *Yates* and *Riela*.

With natural reluctance to differ with a court on a matter so intimately related to that court's own dignity, we feel compelled to disagree. In the first place, we think that the question is not whether petitioner carved out a more limited area of refusal within a broader subject of inquiry, but whether, as in *Costello* and in *Riela*, there was an initial total refusal to answer all questions related to the object of the inquiry. The information made it clear that the inquiry sought to disclose if, through Baker's efforts, a judge had improperly interfered in the disposition of a criminal case. The area of questioning was known to petitioner. His successive representations could only be viewed as relating to the entire inquiry—in effect, a tailored rerun of the interrogation which had already been conducted. In view of the refusal of petitioner's counsel to accept the final stipulation, it is not apparent to us why petitioner's flat pre-stipulation refusal should be deemed irrelevant. It is true that his answer to Special Counsel's question of November 29, looking to his intent as to all future questions was not, technically, an answer, but a refusal to answer. That the import of petitioner's reply boded a future pattern of refusal was indicated by special counsel's question to the Court as to whether he should continue. This being a criminal proceeding, moreover, it seems to us that doubts on this score should be resolved in his favor. *Cf.* United States v. Kamin, *supra* n. 7, 135 F.Supp. at 384.

 The Court's apparent reliance on People v. Saperstein was misplaced. In that case the witness was evasive in replying to five questions attempting to identify the participants in five separate telephone conversations. The fact that he could not tell whether he had taken part in one conversation did not signal to the prosecutor that his memory would be equally poor as to others. It seems to us that the instant case falls within *Riela,* and not *Saperstein,* for the very reasons set forth by Judge Fuld in *Riela.* Here the Court, as well as petitioner, knew the scope and nature of the ques-

tions to be asked. The petitioner having refused to say whether he had met Raymond in the fall of 1961—"[which] could well have furnished 'a link in the chain' ", Emspak v. United States, 394 U.S. 190, 200, 201 n. 24, 75 S.Ct. 687, 694, 99 L.Ed. 997 (1955)—it seems clear a fortiori that he would continue to refuse to answer questions getting closer and closer to the target. We therefore conclude that petitioner's contempt lay in refusing to testify at all on the subject of inquiry, that his communicated intent made it clear at the outset that the authority of the court was frontally challenged and the seriousness of the offense fully delineated, and that the contempt could not thereafter be multiplied forty-three times by running through the entire list of questions.

## B. Waiver

 Apart from any staking out of a claim by petitioner at the outset of the questioning, a second approach to ascertaining the numerosity of contempts lies in considering whether and when petitioner, by answering a question, would, by the law of the Commonwealth, have waived his privilege as to the remaining questions. This factor was, as we have observed, noted by Judge Fuld in People v. Riela, *supra.* That is, while a witness might be mistaken in claiming his privilege, the offense in claiming the privilege is not multiplied by refusals to answer in order to protect the privilege claimed. Or, perhaps more succinctly, one claim of privilege, followed by refusals to waive it, does not thereby become multiple claims.

 The thought underlying the doctrine of waiver by testifying seems to be that when incriminating responses have already been made, the value to a witness of suppressing further incriminating answers may not be so' great as to outweigh the prejudice to another involved person if the testimony is allowed to remain in its witness-selected posture, quite possibly one-sided and distorted. 8 Wigmore on Evidence, § 2276, at 456–58 (McNaughton rev. 1961). Here, of

course, the two judges who were the objects of the information could be deeply affected by any such attempted tailoring or cut-off in testimony by petitioner. Massachusetts case law on this issue is venerable but, so far as we can learn, still vigorous in establishing that "the witness must claim his privilege in the outset, when the testimony he is about to give, will, if he answers fully all that appertains to it, expose him to a criminal charge, and if he does not, he waives it altogether." Foster v. Pierce, 65 Mass. 437, 439 (1853). In Commonwealth v. Price, 76 Mass. 472, 476 (1858), the impact of a witness's testimony on others was recognized: "If a witness consents to testify at all, so as to criminate himself as well as the defendant, in the matter on trial, he must answer all questions legally put him concerning that matter." *See also* Commonwealth v. Pratt, 126 Mass. 462, 463 (1879); Evans v. O'Connor, 174 Mass. 287, 291, 54 N.E. 557 (1899).

 Under this rigorous waiver rule, petitioner would have had difficulty terminating his testimony, once proffered, at any point. In making this observation, we are not concerned with grouping the questions taxonomically, although we do have doubts as to the mutual exclusivity of the Court's groupings.[10] What does appear to us is that once petitioner acknowledged acquaintance with Raymond, the detailed facts of any communication would have been compellable; this would have opened up petitioner's efforts to secure the services of a judge's friend for Raymond, the events surrounding appearances, continuances, and final disposition of Raymond's Middlesex County criminal case; and, of course, with the drama about played out, the final meeting of the cast at the Darbury Room would follow. The information, after all, clearly spelled out the area of possible misconduct of the two judges, that is, that misconduct was "averred, principally at least, to have taken place with respect to a criminal case in Middlesex County".[11] Under Massachusetts law, we think petitioner, once having answered a question or two, would be deemed to have waived his privilege for the remaining interrogation. So viewing the situation faced by petitioner, we refuse to say that he faced the dilemma of incurring multiple penalties for continued refusals to answer or of waiving his privilege if he tried to keep his contempts to a minimum. So for this added reason, that petitioner's reputed refusals were in response to a legitimate interest in protecting his initial resort to the privilege, rather than to effect multiple affronts to the Court, we hold that only a single contempt was committed.

### VI. Length of Incarceration

 While the Court notes in its opinion that there are no facts in dispute and no purpose to be served by a jury trial if a longer sentence is sought to be imposed, we find no basis in the categoric language of Bloom v. Illinois,

10. The grouping was as follows:
 Group I—12 questions: petitioner's "involvements with Raymond in the fall of 1961 and the spring of 1962." In addition, we do not see why No. 14 of Group II and Nos. 17 and 21 of Group III are not properly in Group I.
 Group II—2 questions: petitioner's "involvements with Raymond in June 1962". Similarly, we would suppose that Nos. 5, 8, 9, 10, 11, 12 and 22 of Group I and Nos. 17 and 21 of Group III fit this category.
 Group III—12 questions: petitioner's "involvements with Raymond in September, 1962, particularly with respect to what transpired on September 27 and 28". No. 22 of Group I and No. 34 of Group V would fit under this heading.

 Group IV—6 questions: petitioner's "alleged relationship with Judges DeSaulnier and Brogna in September 1962". No. 35 of Group V would apparently qualify in this Group.
 Group V—3 questions: petitioner's "alleged meeting with Raymond and Judge DeSaulnier at a public place known as the Darbury Room on September 28, 1962. Two of the three, as above indicated, might equally well be placed in other groups.

11. That our summary of the list of questions is not unfairly abbreviated can be seen by noting the Court's own summary of the information which we have reproduced in the second paragraph of this opinion.

391 U.S. at 208–210, 88 S.Ct. 1477, 20 L.Ed.2d 522, delineating such an exception to the jury trial requirement for major crimes. Furthermore, it would seem entirely proper for a jury to consider the extent of intent to affront a court, even in a factually limited situation such as this. Ordinarily, this would give the Court sitting without jury a ceiling of six months. As it happens, however, the first contempts adjudicated merited, in the Court's view, a five-month sentence. Presumably, the offenses subsequent to the twelve on which sentence was first imposed drew a six-month term because they were considered additional and therefore more serious. Under our holding that only one offense was committed, and that at the outset of the questioning, we think due process would be violated by the imposition of a harsher sentence than that imposed for the first offense adjudicated. *Cf.* North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).

We therefore reverse and remand this matter to the District Court with the direction that the writ be issued if, within thirty days from the date of this opinion the aggregate sentence summarily imposed on petitioner is not revised so that it will not exceed five months.