**In re The Matter of the CONTEMPT FINDINGS AGAINST John T. SCHULTZ During the Trial of State of Indiana v. Donald LaBine.**

No. 4–581A4.

Court of Appeals of Indiana, First District.

Dec. 8, 1981.
Rehearing Denied Jan. 28, 1982

Curtis B. Eskew, Corydon, for defendant-appellant.

Linley E. Pearson, Atty. Gen., Dan S. LaRue, Deputy Atty. Gen., Indianapolis, for plaintiff-appellee.

NEAL, Presiding Judge.

Defendant-appellant John T. Schultz appeals from the trial court's order finding Schultz in contempt of the Harrison Circuit Court on twenty-seven (27) occasions and imposing three-month consecutive sentences on each contempt.

We affirm in part and reverse in part.

## STATEMENT OF THE FACTS

On September 24, 1980, Schultz was called by the prosecution to testify at the murder trial of Donald LaBine. The previous month Schultz had been convicted of involuntary manslaughter and arson for his participation in the same crime for which LaBine was being prosecuted. At Schultz's trial, after taking the stand to testify in his own behalf, Schultz had identified LaBine as the person responsible for the victim's death. When subsequently called to testify at LaBine's trial, however, Schultz either refused to answer the State's questions, claiming his privilege against self-incrimination or, upon being threatened with contempt, was repeatedly plagued by a memory lapse.

The record intimates Schultz's recalcitrance reflected his bitterness at receiving a fifty-five year sentence for his convictions. Schultz believed seeking such a lengthy sentence evidenced a failure by the State to appreciate his cooperation in giving the testimony implicating LaBine; consequently, he had resolved to give no further such testimony. During Schultz's direct examination, he consistently invoked his privilege against self-incrimination in response to the State's questions.

In an effort to thwart his refusal to answer, the court granted Schultz immunity. He nevertheless continued to invoke his privilege whenever questioned about the events surrounding the victim's death or his own association with LaBine. Each refusal to answer was viewed by the trial court as a separate contemptuous act, and accordingly, Schultz was found guilty of contempt twenty-seven times. Schultz later made an effort to purge himself of these contempts by responding that he could not remember

rather than invoking his privilege. The trial court was not, however, persuaded that these responses represented a good faith effort to answer the State's questions; therefore, Schultz's twenty-seven contempt citations remained unpurged. Based upon the record, it appears the trial court was justified in finding Schultz was in fact, although not in form, still refusing to testify. *See People ex rel. Cirillo v. Warden of City Prison, Brooklyn*, (1962) 11 N.Y.2d 51, 181 N.E.2d 424, 226 N.Y.S.2d 398.

## ISSUES

On appeal Schultz contends:

I. The grant of immunity extended to him was insufficient because he was never offered "absolute immunity" in that he was not protected from further prosecution in other jurisdictions or for perjury;

II. It was erroneous for the court to conclude Schultz committed twenty-seven separate acts of contempt rather than viewing his refusals as one continuous contemptuous act, and

III. The trial court erred by failing to make a written statement describing Schultz's acts of contempt as required by Ind.Code 34–4–7–7.

1. The State argues Schultz could not refuse to answer by relying upon his Fifth Amendment privilege because he was no longer in jeopardy. due to his earlier convictions. In its argument, the State intimates that since all the questions directed at Schultz during LaBine's trial had already been answered by him at his own trial, there would be no apprehension of criminal prosecution based upon his answers, and therefore, no Fifth Amendment privilege could be invoked. We disagree because this position appears to presuppose that no further incrimination could be incurred.

The privilege against self-incrimination attaches to the witness in each case in which he is called to testify and whether he may invoke it is determined without reference to what was said in the witness' earlier testimony. 98 C.J.S. *Witnesses* § 456b(1) (1957). A witness who waives his privilege in one trial will not be estopped from asserting this privilege as to the same matter in a subsequent proceeding. 81

## DISCUSSION AND DECISION

### *Issue I. Extent of immunity granted*

■ Schultz maintains the immunity extended to him was not sufficient because it afforded no protection from prosecution in other jurisdictions or for perjury. While a grant of immunity may, indeed, be drafted broadly enough to protect an individual from future prosecution for crimes about which he is compelled to testify, we find Indiana's immunity statute, Ind.Code 35–6–3–1, does not extend this protection but, commensurately, that such protection is not constitutionally mandated.

■ The power to compel persons to testify is firmly entrenched in our system of jurisprudence; yet, this power is not absolute. It remains tempered by a number of exceptions, one of which is the Fifth Amendment privilege against compulsory self-incrimination. *Kastigar v. United States*, (1972) 406 U.S. 441, 444, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212. This constitutional privilege protects witnesses from the harsh trilemma of self-accusation, perjury, or contempt, *Murphy v. Waterfront Comm'n*, (1964) 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 by providing that no person may be compelled to render testimony which shows him guilty of any offenses; therefore, Schultz could properly refuse to answer any potentially incriminating questions.[1] This right to remain silent

Am.Jur.2d *Witnesses* § 65 (1976); Annot., 5 A.L.R.2d 1404, 1407 (1949). Thus, the mere fact that Schultz had previously waived his privilege of silence by taking the stand in his own behalf would not give the State carte blanche to compel him to again answer these questions. The State interjects, however, that even if Schultz's prior testimony would not constitute a waiver of his privilege, his answers could no longer place him in jeopardy; consequently, he could not avail himself of this privilege.

Understandably, a witness cannot seek refuge by invoking his privilege against self-incrimination unless at the time he is questioned, he is liable to prosecution and punishment for the offenses which would be disclosed, 98 C.J.S. *Witnesses* § 437 (1957); therefore, it is generally recognized that once a witness has been convicted of the transactions in question, he can no longer claim this privilege. *Reina v. United States*, (1960) 364 U.S. 507, 513, 81

was not, however, inviolable. It is recognized there must be an accommodation between the legitimate demands of the government to compel testimony and the imperatives of the constitutional privilege, *Lefkowitz v. Turley*, (1973) 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274; *Kastigar, supra*; 81 Am.Jur.2d *Witnesses* § 54 (1976); consequently the court was empowered to strip Schultz of this constitutional privilege and compel his testimony by clothing him with immunity which protected him from being prosecuted based upon any inculpatory evidence he rendered. If the court extended immunity to Schultz that was co-extensive with the scope of his privilege, this would effectively supplant his privilege and compel Schultz to testify.

Schultz argues the immunity he received was insufficient to abridge his privilege because it was not "absolute immunity" since he remained subject to further prosecution, specifically, prosecution in other jurisdictions or prosecution for perjury. We agree with Schultz that pursuant to Ind.Code 35–6–3–1, he was subject to further prosecution, but we reject his argument that this immunity was therefore constitutionally infirm.

When a witness testifies under the auspices of an immunity act, the extent of the immunity granted has significant ramifications for the witness as well as the government. If the witness receives transactional immunity he will be secure from any future indictment or conviction for the offenses to which his compelled testimony relates;

transactional immunity, in effect, operates as a complete pardon for the offenses disclosed by the witness' testimony. An award of use immunity, however, simply prohibits prosecutorial authorities from using compelled testimony in any respect but does not proscribe future prosecutions. *Kastigar v. United States*, (1972) 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212; 81 Am.Jur.2d *Witnesses* § 59 (1976).

■ Indiana's immunity statute, Ind. Code 35–6–3–1 provides in pertinent part: "If, but for this section the witness would have been privileged to withhold the answer given or the evidence produced, *he shall not be prosecuted* or subjected to penalty or forfeiture *for or on account of any answer given* or evidence produced: Provided, further, That such immunity shall not be allowed in the case of any perjury, false swearing or contempt committed in answering, or failing to answer, or in producing, or failing to produce, evidence in accordance with the order of the court." (Emphasis added.)

Although the legislature did not expressly identify which form of immunity it intended to create by enacting Ind.Code 35–6–3–1, since the standard language employed in transactional statutes prohibits prosecution for any offense to which the compelled testimony relates, *Kastigar, supra*, at 453, 92 S.Ct. at 1661; *Uniformed Sanitation Men Ass'n, Inc. v. Commissioner of Sanitation of City of New York*, (2 Cir. 1970) 426 F.2d 619, whereas Ind.Code 35–6–3–1 permits

S.Ct. 260, 264, 5 L.Ed.2d 249; *United States v. Hoffman*, (7 Cir. 1967) 385 F.2d 501; *cf. Millington v. State*, (1972) 154 Ind.App. 42, 289 N.E.2d 161. It must, however, be remembered that the privilege, although lost after conviction, is lost only as to the crime for which a conviction was obtained. Annot., 9 A.L.R.3d 990, 1003 (1966). In the case at bar, the State makes no attempt to foreclose the possibility that Schultz's responses could have disclosed his involvement in offenses for which he has not yet been prosecuted. Thus, while we in no way wish to sanction using the privilege against self-incrimination as a subterfuge or condone mere caprice or recalcitrance, we are reluctant to declare Schultz's claims of privilege were all unjustified. Courts must be circumspect in preserving the privilege if there is

a possibility of conviction for any other offenses.

Finally, it should be observed that although Schultz had already been convicted before he was called to testify at LaBine's trial, this conviction was being challenged on appeal. Other courts have been reluctant to hold a conviction which is still being contested should result in a loss of the privilege against self-incrimination, 98 C.J.S. *Witnesses* § 437a (1957); Annot., 9 A.L.R.3d 990, 1001 (1966), since it remains uncertain whether, in fact, the witness could yet face prosecution for the matter about which the testimony relates. Only when we are firmly convinced the reason for the privilege against self-incrimination has ceased, should the privilege also be found to have ceased.

prosecution for any offenses provided the prosecution is not instituted because of any answer given by the witness, we find this statutory language must be construed as vesting witnesses only with use immunity. *Worthington v. State*, (1979) Ind.App., 391 N.E.2d 1164; Kerr, *Survey of Recent Developments in Indiana Law, VI. Criminal Procedure*, 7 Ind.L.Rev. 112, 134 (1973).

In reaching this conclusion, we are mindful that our immunity statute was patterned after the MODEL STATE WITNESS IMMUNITY ACT, 9C Uniform Laws Ann. 206 (1957), which is a transactional immunity statute. *State ex rel. Pollard v. Criminal Court of Marion County, Division One*, (1975) 263 Ind. 236, 329 N.E.2d 573, 591. However, while the Model Act may have supplied the initial blueprint, it must be noted that our legislature made some critical modifications which we believe transformed our statute into a use rather than a transactional immunity statute. *See* Kerr, *Survey of Recent Developments in Indiana Law, VIII. Criminal Law and Procedure*, 9 Ind.L.Rev. 160, 177 (1975).

The Model Act followed the language traditionally employed in transactional statutes by providing that witnesses *"shall not be prosecuted* or subjected to penalty or forfeiture *for or on account of any transaction,* matter or thing *concerning which,* in accordance with the order, *he gave answer* or produced evidence." (Emphasis added.) *See, e.g., Reina v. United States*, (1960) 364 U.S. 507, 81 S.Ct. 260, 5 L.Ed.2d 249; *Uniform Sanitation Men Ass'n, Inc. v. Commissioner of Sanitation of City of New York*, (2 Cir. 1970) 426 F.2d 619. This statutory language plainly operates as a complete prohibition upon any prosecution for offenses to which the witness' testimony relates. Indiana's immunity statute, on the other hand, permits prosecution for *any* offenses, including offenses about which the

witness has been compelled to testify, provided there is no prosecution "for or on account of any answer given or evidence produced." Thus, Ind.Code 35–6–3–1 does not shelter Schultz from further prosecution; it simply entitles him not to be put to disadvantage in a subsequent trial by reason of his compelled testimony. We, therefore, conclude Schultz is correct when he asserts the immunity granted to him did not protect him from further prosecution,[2] but we reject his claim that the immunity granted was therefore inadequate. While prior to *Murphy v. Waterfront Comm'n*, (1964) 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678, transactional immunity was often viewed as a necessary predicate for contempt, *Uniformed Sanitation Men Ass'n, Inc., supra*, at 623, *see also Overman v. State*, (1924) 194 Ind. 483, 143 N.E. 604, there is no continuing legal vitality to this position.

The United States Supreme Court has made it clear that it is only necessary for an immunity statute to supply protection from the perils which the constitutional privilege is designed to guard. In order then to be valid, a grant of immunity need only extend protection commensurate with that afforded by the privilege against compulsory self-incrimination. *Kastigar, supra* 406 U.S. at 453, 92 S.Ct. at 1661; *Murphy, supra*. Since the object of this privilege is to insure that a person is not compelled, when acting as a witness, to give any testimony which might tend to show he has committed a crime, *Counselman v. Hitchcock*, (1892) 142 U.S. 547, 562, 12 S.Ct. 195, 197–198, 35 L.Ed. 1110, a grant of immunity will be sufficient to supplant this privilege once the witness has been protected against the use of his compelled answers and any evidence derived therefrom, *Lefkowitz v. Turley*, (1973) 414 U.S. 70, 78, 94 S.Ct. 316, 322, 38 L.Ed.2d 274, because this use immunity leaves the

---

**2.** Our construction of the extent of the immunity granted under Ind.Code 35–6–3–1 is consistent with the trial court's oral advisement to Schultz that he was being granted "immunity from prosecution *for* any statements, testimony or other evidence of any kind produced pursuant to questions or other requests by the State

of Indiana in this matter" as well as the court's subsequent advisement to the jury that Schultz had been granted immunity, which meant "anything that he says hereinafter cannot be used to prosecute him in this State or any other State."

government in substantially the same position in having the answer but being unable to use it or its fruits as it would have been if the witness had invoked his privilege and remained silent. *Murphy, supra* 378 U.S. at 79, 84 S.Ct. at 1609; *Uniformed Sanitation Men Ass'n, Inc., supra* at 628. As stated in *Murphy, supra,* 378 U.S. at 77–78, 84 S.Ct. at 1608–1609:

> "We hold that the constitutional privilege against self-incrimination protects a state witness against incrimination under federal as well as state law and a federal witness against incrimination under state as well as federal law."

Use immunity is, therefore, constitutionally sufficient.

■ The constitution does not go so far as to permit a witness to refuse to answer merely because of the apprehension of further criminal prosecution. While a witness must be protected from the use of compelled testimony, he need not be protected from all prosecutions to which his compelled testimony relates. *Kastigar, supra* 406 U.S. at 453, 92 S.Ct. at 1661; *Murphy v. Waterfront Comm'n,* (1964) 378 U.S. 52, 106, 84 S.Ct. 1594, 1617, 12 L.Ed.2d 678 (White, J., concurring); *Worthington v. State,* (1979) Ind.App., 391 N.E.2d 1164, 1167.

> "Transactional immunity . . . affords the witness considerably broader protection than does the Fifth Amendment privilege. The privilege has never been construed to mean that one who invokes it cannot subsequently be prosecuted."

*Kastigar, supra* 406 U.S. at 453, 92 S.Ct. at 1661; *accord Worthington, supra* at 1167. Clearly, the constitution does not require us to transform the possibility of further prosecution in this or another jurisdiction into a source of absolute protected silence on the part of the witness. We, therefore, find the immunity granted to Schultz pursuant to Ind.Code 35–6–3–1 was not inadequate because it failed to protect him from subsequent prosecutions.

We note that although we have tested the extent and the adequacy of Indiana's statutory grant of immunity in accordance with the requirements of the Fifth Amendment, since its privilege against self-incrimination has been found applicable to the states under the due process clause of the Fourteenth Amendment, *Malloy v. Hogan,* (1964) 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653; *see* 81 Am.Jur.2d *Witnesses* § 58 (1976), early Indiana Supreme Court rulings interpreting the constitutional guaranty found in our state constitution also support the conclusion that the privilege against self-incrimination is intended merely to prohibit the use of compelled testimony. *Bedgood v. State,* (1888) 115 Ind. 275, 17 N.E. 621; *Wilkins v. Malone,* (1860) 14 Ind. 153. In construing the protection afforded under Article 1, section 14 of our Constitution, which provides that "No person, in any criminal prosecution, shall be compelled to testify against himself," our Supreme Court stated:

> "[T]he constitution itself would furnish the party a protection by excluding the answers thus elicited, in any subsequent criminal case.
>
> \*   \*   \*   \*   \*   \*
>
> It exempts no one from the consequences of a crime which he may have committed, but only from the necessity of himself producing the evidence to establish it."

*Wilkins, supra* at 155–156.

■ We, therefore, conclude the immunity granted to Schultz, pursuant to Ind. Code 35–6–3–1, was not insufficient simply because he remained subject to further prosecution in other jurisdictions. We also find no merit in Schultz's assertion that this immunity was inadequate because he was not protected from prosecution for perjury. *Worthington v. State,* (1979) Ind.App., 391 N.E.2d 1164. Since the privilege against self-incrimination entitles a witness to keep silent, but does not license him to commit perjury, 98 C.J.S. *Witnesses* § 436 (1957), the adequacy of an immunity statute is not affected by the fact it affords a witness whose incriminating testimony is compelled no protection against prosecution for perjury in giving such testimony. 81 Am.Jur.2d *Witnesses* § 54 (1976); Annot., 53 A.L.R.2d 1030 (1957). As to any perjury antedating the immunity order, the court's grant of use

immunity would apparently protect Schultz from being prosecuted for this perjury based upon the testimony he was compelled to give at LaBine's trial.

*Issue II.  Multiple contempt citations*

■ In Schultz's second assignment of error, the issue is whether it is proper for the trial court to find Schultz guilty of a separate act of contempt for each time he refused to answer the State's questions or whether this, instead, was an improper multiplication of contempts.

We commence our analysis with an examination of the statute. Ind.Code 34–4–7–2 states in pertinent part:

"Every person who, being sworn to testify as a witness in any court of record, in any trial or proceeding therein, shall refuse to testify touching the same; or who, being required by any court to be sworn . . . shall refuse to take an oath or affirmation . . . shall be deemed guilty of a direct contempt of court . . . ."

Schultz was called as a witness, but before he took the witness stand, or took the oath, he informed the court and the prosecuting attorney that he did not want to testify. Upon threat of contempt Schultz took the oath, but refused to answer any questions relative to the homicide claiming as his reason his privilege against self-incrimination. After six questions and six findings of contempt, immunity was granted, but Schultz continued to invoke the privilege and refused to answer the questions asked of him, all relating in one way or the other to the homicide. The State, nevertheless, pursued that line of questioning. Each time Schultz refused to answer their questions relating to the homicide, the trial court found him guilty of a new act of contempt.

Since we have determined that the statutory immunity given Schultz was constitutionally sufficient to supplant his exercise of the Fifth Amendment privilege, his reliance upon the privilege after immunity was given was unjustified and constituted an act of contempt. The question becomes whether, once Schultz alerted the prosecuting attorney and the court of the subject matter about which he would not testify, the prosecuting attorney could properly compound the number of offenses by persistent and repeated questions concerning matters within that subject area. Our review of the cases addressing this issue leads us to conclude that Schultz committed only one act of contempt and the finding of multiple contempts was therefore erroneous.

The rule governing this issue recognized in virtually all the jurisdictions was stated by the United States Supreme Court in *Yates v. United States*, (1957) 355 U.S. 66, 73, 78 S.Ct. 128, 133, 2 L.Ed.2d 95:

"We deem it *a fortiori* true that where a witness draws a line of refusal . . . by declining to answer questions within a generally defined area of interrogation, the prosecutor cannot multiply contempts by further questioning within that area."

*See also, United States v. Yukio Abe*, (D.C. Haw.1950) 95 F.Supp. 991, 992; Annot. 94 A.L.R.2d 1256 (1964).

The Court in *Yates* did not expressly consider whether the problem of multiple contempts was of constitutional dimension. The rule was more recently applied in *Baker v. Eisenstadt*, (1 Cir. 1972) 456 F.2d 382, cert. denied, 409 U.S. 846, 93 S.Ct. 110, 34 L.Ed.2d 87, a habeas corpus proceeding in which state court action imprisoning the petitioner for multiple contempts for his refusal to testify in a judicial misconduct investigation was overturned. After an extensive analysis of the cases, the *Baker* court, following *Yates*, concluded that only one contempt was committed. Without elaboration, the court further indicated that constitutional proscriptions were involved by stating, 456 F.2d at 395:

"Under our holding that only one offense was committed, and that at the outset of the questioning, we think due process would be violated by the imposition of a harsher sentence than that imposed for the first offense adjudicated."

*Accord, Second Additional Grand Jury v. Cirillo*, (1963) 12 N.Y.2d 206, 237 N.Y.S.2d 709, 188 N.E.2d 138, 94 A.L.R.2d 1241.

 

We summarize our holding as follows. Our statute does not provide for multiple penalties for refusal to testify. Under the above authorities it was of no consequence that the questions were not simply the same questions rephrased, since they all fell within the area of refusal carved out by Schultz, namely, the homicide. His refusal to answer the questions was effectively one continuing act of contempt. It was, therefore, erroneous for the trial court to find Schultz guilty of twenty-seven separate contemptuous acts.

*Issue III. Noncompliance with Ind.Code 34–4–7–7*

 The final issue raised by Schultz is whether the trial court's finding of contempt is valid since the court failed to make a written statement describing Schultz's acts of contempt as required by Ind.Code 34–4–7–7.[3] We find that although the court did not follow the letter of the statute, reversal of Schultz's contempt conviction is not warranted since no harm has been shown by the absence of this statement. *Skolnick v. State*, (1979) Ind.App., 388 N.E.2d 1156.

> "Observance of the [writing] requirement is vital when the trial court's written statement is all that reveals the contumacious conduct to the reviewing court, but is of less importance when the nature of the conduct is easily discernible from the record."

*Aguilar v. State*, (1981) Ind.App., 416 N.E.2d 887, 891.

It is apparent the lack of a written statement has posed no obstacle for Schultz in preparing this appeal, nor has it hampered us in our review of Schultz's contempt citations since it is easily discernible from the record why the trial court found Schultz in contempt. The court's failure to comply with Ind.Code 34–4–7–7 does not, therefore, require reversal.

The judgment of the trial court is accordingly affirmed in part and reversed in part insofar as the court found Schultz guilty of more than one act of contempt.

ROBERTSON and RATLIFF, JJ., concur.

---

**3.** Ind.Code 34–4–7–7 provides in part:

"When any person shall be arraigned for a direct contempt, in any court of record of this state, no affidavit, charge in writing, or complaint shall be required to be filed against him; but the court shall distinctly state the act, words, signs or gestures, or other conduct of the defendant which is alleged to constitute such contempt; *and such statement shall be reduced to writing either by the judge making it, or by some reporter autho-* rized by him to take it down when made; and the same shall be substantially set forth in the order of the court on the same, together with any statement made in explanation, extenuation, or denial thereof, which the defendant may make in response thereto; and the court shall thereupon pronounce judgment, either acquitting and discharging the defendant, or inflicting such punishment upon him as may be consistent with the provisions of this act[.]" (Emphasis added.)