In re John P. RYAN, Samuel H. Lee, Ann L. O'Brien, and Joan E. Andrews, Petitioners,

v.

Edward MORELAND, Director of St. Louis County Department of Justice Services, Respondent.

No. 46569.

Missouri Court of Appeals, Eastern District, Division Three.

June 2, 1983.

J. Martin Hadican, Joyce Y. MacDonald, St. Louis, for petitioners.

Hugh R. Law, St. Louis, for respondent.

STEPHAN, Presiding Judge.

This is an original proceeding in habeas corpus in which the petitioners attack the lawfulness of their detention by the Director of St. Louis County Department of Justice Services. An outline of the facts leading up to their incarceration follows. On November 10, 1980, petitioners Ryan, Lee, O'Brien, Andrews and thirty-six others were enjoined by the Circuit Court of St. Louis County, Provaznik, J., from certain activities related to the conduct of the business of the Del Crest Plaza and, in particular, its tenant, the Ladies Center, Inc., in University City, Missouri. Thereafter, on October 4, 1982, October 21, 1982, October 29, 1982, and November 3, 1982, petitioners were ordered to show cause why they should not be held in contempt of court for various violations of the injunction. A hearing was held on the contempt citations on November 22, 1982; and, on December 2, 1982, the Circuit Court issued its judgments finding petitioners Ryan and Andrews guilty of five counts of indirect criminal contempt and petitioners O'Brien and Lee guilty of six counts of indirect criminal contempt. Each petitioner was sentenced to a jail term for each of the violations, the terms to be served consecutively. Ryan's and Andrews' sentences total 225 days each;

O'Brien's and Lee's sentences total 314 days each. Ryan, O'Brien, and Lee began serving their terms on December 3, 1982, and filed their petitions for habeas corpus on that same day. This Court issued its writs on that day and released Ryan, O'Brien, and Lee on bond forthwith. Petitioner Andrews began serving her sentence on January 3, 1983, filed her petition for habeas corpus on the same day, and was also released on bond forthwith. Andrews' case was consolidated with those of the other petitioners. In the cases of Ryan, O'Brien, and Lee, the writs were initially addressed to Harold Hoeh, Sheriff of St. Louis County. By consent of the parties, Edward Moreland, Director of the St. Louis County Department of Justice Services was substituted for Sheriff Hoeh as respondent, and Mr. Moreland has made returns in the cases of all petitioners. Answers were duly filed, and the matter has been briefed and argued before this Court.

The body of the injunction which petitioners were found guilty of violating, omitting the names of the others enjoined, reads as follows:

"That Defendants . . . Joan E. Andrews, . . . Samuel H. Lee, . . . Ann Lamb O'Brien, . . . John P. Ryan, . . . are hereby enjoined from entering upon any portion of the premises, lawns, and parking lot of the Del Crest Plaza, 8420 through 8452 Delmar Boulevard, University City, Missouri, and in particular, although not limited to, the premises and entry at 8448 Delmar Boulevard, with the intent, purpose, or result of interfering, disturbing, disrupting, confronting, undermining, or dissuading the operation, activities, or conduct of any of Plaintiffs' normal and ordinary business, or that of its tenant the Ladies Center, Inc., or any other tenant of Plaintiffs, or of the business of the employees, patients, and/or business invitees of Plaintiffs, the Ladies Center, Inc., or any other tenant of Plaintiffs, or from engaging in any other unlawful acts with those intents, purposes, or results, including, without limitation thereof, the blocking of the entry at 8448 Delmar Boulevard and the encouragement, solicitation, or direction of such blocking or any other of the foregoing proscribed activities. All persons receiving notice of or a true copy of this Order and acting in concert or in privy with any of the above-named Defendants in the planning or commission of any acts herein enjoined or restrained are hereby similarly enjoined and restrained themselves."

The order was entered as a result of negotiations in the underlying case which sought injunctive relief against petitioners and others. The negotiations resulted in a stipulation between the plaintiffs and defendants to the effect that defendants had "no objection to the entry of a permanent injunction against them" in the terms set out above. An earlier draft had provided that defendants "consented" to the entry of the injunctive order; but, at their request, the phraseology was changed to show they had "no objection" to its entry. Petitioners received advice of counsel throughout the negotiations as well as after the stipulation was entered into.

We glean from the transcript of the contempt proceedings conducted before Judge Provaznik, from the pleadings, briefs and representations of the parties' counsel during various appearances before this Court that this matter had its genesis in many demonstrations by petitioners and others at the Ladies Center, an abortion clinic in the Del Crest Plaza. These demonstrations, according to petitioner Lee, had as their "foremost" purpose the protection of fetuses which were to be the subjects of abortions and the counseling of women seeking abortions. Plaintiffs in the underlying injunction proceedings, on the other hand, obviously regarded the petitioners' activities as unlawful disruptions of their business and that of their tenant, the Ladies Center, as well as harassment of the business invitees of the Center. Petitioners and others were charged with a multitude of city ordinance violations arising out of the demonstrations, and they became the defendants in a suit by the owners of the clinic seeking to enjoin such activities in the future. The injunction set out above was

to be in settlement of all disputes between the clinic owners and petitioners.

■ The evidence adduced at the contempt hearings before Judge Provaznik clearly indicates that, commencing on September 18, 1982, all four of the petitioners participated in demonstrations which included blocking the doorway to the Ladies Center and attempting orally to dissuade women who wished to enter from doing so, refusing to leave the area of the doorway when asked to do so by police officers and representatives of the Ladies Center, and generally attempting to interfere with the business of the Ladies Center. These activities were repeated by all four petitioners on October 2, October 9, and October 16, 1982. On October 6, petitioner Andrews stationed herself at the entrance to the Ladies Center and urged persons not to enter the premises. Petitioners O'Brien and Lee engaged in such activities on October 23 and 30, and were joined by Ryan on October 30, 1982. That the petitioners were aware of the terms of the injunction at the time each act was committed is made abundantly clear from the record. For example, Lee, O'Brien, and Ryan were present in court on November 10, 1980, when Judge Provaznik read the order to them. Thereafter, all four of the petitioners were provided with copies of the injunction on numerous occasions and heard it read several times over bullhorns at the scene of their demonstrations. In finding the petitioners guilty, Judge Provaznik made meticulous findings of fact as to each violation by each petitioner, found the facts to be true beyond a reasonable doubt, and that each act in disobedience of the injunction was a willful, deliberate and knowing violation. In short, the activities of the petitioners as charged in the orders to show cause and the evidence adduced at the trial present, on the surface, a classic example of indirect criminal contempt: conduct outside of the

presence of the contemned court in violation of the dignity of the court and in derogation of its decrees. See *Mechanic v. Gruensfelder,* 461 S.W.2d 298, 304–305 (Mo. App.1970); *Curtis v. Tozer,* 374 S.W.2d 557, 568–569 (Mo.App.1964). Each sentence was entered by separate judgment, with those subsequent to the first being entered in chronological order of the violations involved, each referring to the previous sentences and providing that they were to be served consecutively.[1]

Petitioners raise two points in support of their contention that their incarceration would be unlawful: that they were denied a jury trial on the issue of their guilt of the contempt charges; and that the judgments and orders of commitment are void because they lack specificity "in that they do not state the essential facts constituting the criminal contempt and fixing the punishment and for the reason that the petitioners did not intend to be disrespectful of the court."

■ Examination of the transcript of the trial of November 22, 1982, reveals that, after a brief opening statement, the special prosecutor called his first witness and the taking of evidence proceeded without any reference to a jury. Respondent has conceded that the failure of the petitioners or their counsel to demand a jury trial does not, in itself, constitute a waiver of that right. Although, "a proceeding for criminal contempt is sui generis, and as such is controlled by its own rules ...," one charged with criminal contempt is entitled to essentially the same rights of procedural due process as a defendant in a criminal case. *Mechanic v. Gruensfelder,* supra, 461 S.W.2d 309. Accordingly, we hold that waiver of the right to a jury may be accomplished in a case of criminal contempt only by affirmative act of the defendant, with the assent of the trial court, entered of

---

1. The sufficiency of the evidence to support the Circuit Court's findings of fact, as such, is not under attack by petitioners. Consequently, we do not set out every evidentiary detail supporting the twenty-two separate violations with which we are here concerned. We have, how-

ever, read the entire transcript and are satisfied that the findings of the violations beyond a reasonable doubt are fully justified. Other facts will be alluded to as warranted by the following discussion.

record. Rule 27.01; *Girard v. Goins*, 575 F.2d 160, 162 (8th Cir.1978). The threshold issue in this case, however, is whether the right to trial by jury existed at all.

■ A jury trial in "serious" contempt cases has been recognized as a right secured by the Sixth Amendment to the United States Constitution. The right is guaranteed to contemnors in state cases through the Fourteenth Amendment. The development of this rule is traced in *Codispoti v. Pennsylvania*, 418 U.S. 506, 511–512, 94 S.Ct. 2687, 2691, 41 L.Ed.2d 912, 919 (1974):

> In *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), the Court held that the Fourteenth Amendment guaranteed to defendants in state criminal trials the right to jury trial provided in the Sixth Amendment. In a companion case, *Bloom v. Illinois*, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968), the Court held that while petty contempts, like other petty crimes, could be tried without a jury, serious criminal contempts had to be tried with a jury if the defendant insisted on this mode of trial. Although the judgment about the seriousness of the crime is normally heavily influenced by the penalty authorized by the legislature, the Court held that *where no legislative penalty is specified and sentence is left to the discretion of the judge, as is often true in the case of criminal contempt, the pettiness or seriousness of the contempt will be judged by the penalty actually imposed.* Finally, the Court recognized that sentences up to six months could be imposed for criminal contempt without guilt or innocence being determined by a jury, but a conviction for criminal contempt in a nonjury trial could not be sustained where the penalty imposed was 24 months in prison. Since that time, our decisions have established a fixed dividing line between petty and serious offenses: those crimes carrying a sentence of more than six months are serious crimes and those carrying a sentence of six months or less are petty crimes. (Emphasis added).

Codispoti had been a defendant in a state criminal trial in which he acted as his own counsel and engaged in activities seriously disruptive of the trial. After the jury returned a verdict of guilty, the trial judge pronounced him guilty of seven separate acts of contempt, and sentenced him to consecutive sentences of one to two years for each contempt. One of Codispoti's codefendants in that trial who had similarly been held in contempt and sentenced was granted certiorari by the United States Supreme Court, which vacated the contempt convictions and remanded them for retrial before "a judge other than the one reviled by the contemnor." *Mayberry v. Pennsylvania*, 400 U.S. 455, 466, 91 S.Ct. 499, 505, 27 L.Ed.2d 532, 540 (1971). Upon retrial before another judge, Codispoti demanded a jury trial. The demand was denied; he was found guilty of the seven contemptuous acts and sentenced to six months in prison for six of the offenses and three months for another. The sentences were ordered to run consecutively. After affirmance by the Pennsylvania Supreme Court, Codispoti's case and that of another codefendant came before the Supreme Court on certiorari on the issue of whether they should have been afforded a jury trial. The Supreme Court noted that the question of a right to a jury trial had not been determined in a case where the "sentences imposed after posttrial convictions for contemptuous acts during trial were to be served consecutively and, although each was no more than six months, aggregated more than six months in jail." *Codispoti*, 418 U.S. 512–513, 94 S.Ct. 2691, 41 L.Ed.2d 919.

A divided court held that "(i)n terms of the sentence imposed, which was obviously several times more than six months, each contemnor was tried for what was equivalent to a serious offense and was entitled to a jury trial." In arriving at the conclusion that the case had to be remanded, the court found "unavailing" respondent's arguments that the contempts were in fact separate acts and, since the sentence imposed for each was less than six months, each contempt was a petty offense triable without a jury. Rather, the court found "the salient

fact" to be that all of the "contempts arose from a single trial, were charged by a single judge, and were tried in a single proceeding." *Id.,* 418 U.S. 517, 94 S.Ct. 2693, 41 L.Ed.2d 922.

 As in *Codispoti,* the law of this State provides that punishment for criminal contempt is left to the discretion of the court imposing it. See Rule 36.01; §§ 476.-110, 476.120, 476.130, RSMo 1978. We therefore acknowledge in the instant case that "we are to look to the penalty actually imposed as the best evidence of the seriousness of the offense." *Bloom v. Illinois,* 391 U.S. 194, 211, 88 S.Ct. 1477, 1487, 20 L.Ed.2d 522, 534 (1968). If our inditement of the applicable law and the facts of this case were to end here, it would appear that the petitioners were each convicted of "serious" offenses because each was sentenced to a total of more than six months imprisonment. From this it would necessarily follow that the failure of the Circuit Court to afford them a jury trial, in absence of an affirmative waiver, mandates a remand for trial by jury or for resentencing so that their contemptuous conduct could be recharacterized a "petty offense" by imposition of sentences which aggregate six months or less. Cf. *Taylor v. Hayes,* 418 U.S. 488, 496, 94 S.Ct. 2697, 2702, 41 L.Ed.2d 897, 906 (1974). To adopt such a course, however, would require us to ignore the genesis of this case in the trial court. Unlike the situation in *Codispoti,* the contempts here did not grow out of a unitary course of conduct, i.e., continuing statements of disrespect for and villification of a judge during the course of a trial. Rather, the acts which formed the basis for the twenty-two separate findings of contempt here were committed over a six week period on occasions approximately one week apart. The violations of the injunction involved various types of conduct and interference with different persons seeking entrance to the Ladies Center. Each violation was the subject of different charges contained in motions and supplemental motions to cite for contempt and orders to show cause; each was the subject of a separate warrant and order of commitment setting forth in detail the facts constituting the contempt and the punishment imposed.

This point may be elucidated by reference to an earlier case arising out of multiple violations of an order issued by the Circuit Court of the City of St. Louis and resulting in convictions of twelve persons for criminal contempt. *State ex rel. Girard v. Percich,* 557 S.W.2d 25 (Mo.App.1977). Eight of the persons received sentences varying in duration from ten to forty days and fines were levied in amounts varying from $2,500 to $10,000. This Court initially issued writs of habeas corpus; but, after the matter was briefed and argued, the writs were quashed as to all petitioners except one, against whom the evidence was held insufficient. The remaining petitioners unsuccessfully sought relief in the Supreme Court of Missouri and in Federal District Court. *Girard v. Goins,* 442 F.Supp. 1250 (E.D.Mo.1978). On appeal from the District Court's denial of habeas corpus, the Eighth Circuit remanded "the case to the District Court with directions to it to issue the requested writs of habeas corpus unless the Circuit Court of the City of St. Louis either reduces the fines to the level of a non-serious offense or provides the petitioners with an opportunity for a new trial with a jury ..." *Girard v. Goins,* 575 F.2d 160, 165 (8th Cir.1978). The specific reason for this action expressed by the court is "that fines ranging from $2,500 to $10,000 assessed against the individual petitioners do indeed constitute a serious offense." *Id.* The Circuit Court thereafter reduced the fines to $500 each and ordered that nonpayment of the fines would not be grounds for any additional confinement, whereupon the District Court dismissed the petitions for habeas corpus. *Girard v. Goins,* 457 F.Supp. 369 (E.D.Mo.1978).

It is obvious from reading the various *Girard* cases that the constitutional infirmity later perceived by the Eighth Circuit arose from the treatment of the matter at the stage of the hearings on the motions to cite for contempt. The contemnors were officers and members of a striking labor union who were directing or participating in harassment and intimidation of the em-

ployers' customers. Although there was evidence of many separate instances of violations of the restraining order involving all or some of the contemnors, the matter resulted in a singular judgment against each for an undifferentiated mass of contemptuous behavior as evidenced by the "lump sum fines." The matter therefore became a "serious" offense, as that term has been discussed, supra.

Such is not the case here. As pointed out above, each violation of the injunction by each petitioner was treated as a separate, discrete occurrence; each finding of guilt was followed by a separate sentence well within the "six month" line of demarcation between "serious" and "petty" offenses proclaimed by the United States Supreme Court.[2] It is the element of discreteness that we believe distinguishes this case from the effect of aggregation present in *Codispoti* and which caused the court there to conclude that each petitioner was effectively being tried for *one* serious offense. The petitioners before us now were tried for several "petty" offenses. Indeed, as was noted in *Girard v. Goins,* supra, 575 F.2d 164, the jail sentences "are not alone enough to require that an opportunity for a jury trial be offered . . ." because the maximum sentence imposed on any of the contemnors was forty days. For us to accept petitioners' arguments in this regard would constitute an illogical extension of *Codispoti* and hold that separate petty offenses arising out of separate acts somehow add up to one serious offense, triggering the constitutional right to trial by jury. In this connection, under questioning by this Court on oral argument, counsel for petitioners conceded candidly that, if the Circuit Court had tried each violation on different days in separate proceedings, the sentences would be proper as imposed.

We have examined many cases in which the possibilities of judicial abuses in imposing a series of "petty" punishments have been explored and find them inapposite here. For example, the misconduct of these petitioners was not directed personally to the trial judge; they were not made up of "fighting words" such as those discussed in *Mayberry,* supra, 400 U.S. 455, 466, 91 S.Ct. 499, 505, 27 L.Ed.2d 532, 540. Nor were the acts but different expressions of the same contemptuous mindset reflected in a witness' ongoing refusal to answer questions such as in *Baker v. Eisenstadt,* 456 F.2d 382 (1st Cir.1972). See also the discussion of this latter genus of cases in *In Re Chase,* 468 F.2d 128, 134–136 (7th Cir.1972). On the contrary, we think that the instant case is analogous to *In Re Puerto Rico Newspaper Guild Local 225,* 476 F.2d 856 (1st Cir. 1973). In that case, criminal contempt convictions of a local and international union for numerous violations of a temporary injunction were affirmed in spite of the trial court's denial of their demands for a jury trial and the subsequent imposition of fines of not more than $500 on each individual count.[3] The fines against the local amount-

2. The counts against each petitioner, the date of the violation on which each occurred and the sentence imposed for each are as follows:

Ryan: Count I, September 18, 1982, 15 days; Count II, October 2, 1982, 30 days; Count III, October 9, 1982, 45 days; Count IV, October 16, 1982, 60 days; Count V, October 30, 1982, 75 days.

Lee: Count I, September 18, 1982, 15 days; Count II, October 2, 1982, 30 days; Count III, October 9, 1982, 45 days; Count IV, October 16, 1982, 60 days; Count V, October 23, 1982, 75 days; Count VI, October 30, 1982, 89 days.

O'Brien: Count I, September 18, 1982, 15 days; Count II, October 2, 1982, 30 days; Count III, October 9, 1982, 45 days; Count IV, October 16, 1982, 60 days; Count V, October 23,

1982, 75 days; Count VI, October 30, 1982, 89 days.

Andrews: Count I, September 18, 1982, 15 days; Count II, October 2, 1982, 30 days; Count III, October 6, 1982, 45 days; Count IV, October 9, 1982, 60 days; Count V, October 16, 1982, 75 days.

3. The significance of a fine's not being in excess of $500 in a nonjury contempt case derives from reference by the United States Supreme Court to 18 U.S.C. § 1 as the dividing line between "serious" and "petty" offenses in the federal criminal system. That section provides in part, "(3) Any misdemeanor, the penalty for which does not exceed imprisonment for a period of six months or a fine of not more than $500, or both, is a petty offense." In *Duncan v. Louisiana,* 391 U.S. 145 [88 S.Ct. 1444], 20

ed to $9,050 and $5,650 against the international, levied on the basis of the district court's finding the former guilty of twenty-one and the latter guilty of thirteen violations.

The First Circuit, in *Guild Local 225,* carefully considered arguments made on behalf of the unions that because the fines exceeded $500 in the aggregate, they were

entitled to jury trials. Its analysis proceeded on the theory that if the fines were to be regarded as a singular punishment in excess of $500, then the matter was necessarily triable by a jury. No allowance was made for or consideration given to the resources of the unions, as discussed in Footnote 3. In arriving at the determination that the offenses could properly be regarded as distinct matters and that the fines could stand

L.Ed.2d 491 (1968), the court sought to determine whether the United States Constitution secured the right to a jury trial to a defendant in a state criminal prosecution for a crime that carried with it a maximum punishment of a fine of $300 and imprisonment for two years. In holding that the Fourteenth Amendment extended the right to a jury trial to state prosecutions, the court referred to 18 U.S.C. § 1 as an objective criterion to be applied in the distinction between "petty" and "serious" offenses, the latter requiring a jury trial unless waived. *Id.,* 391 U.S. 161 [88 S.Ct. 1453–1454], 20 L.Ed.2d 503. The court applied the same standard in *Bloom v. Illinois,* 391 U.S. 194 [88 S.Ct. 1477], 20 L.Ed.2d 522 (1968) in determining that the right to a jury trial existed in a criminal contempt case where the punishment was left to the discretion of the sentencing court and the contemnor was actually sentenced to imprisonment for two years. *Dyke v. Taylor Implement Mfg. Co.,* 391 U.S. 216 [88 S.Ct. 1472], 20 L.Ed.2d 538 (1968) involved another state criminal contempt conviction in which a Tennessee chancery court imposed the maximum sentence provided by statute for contempt, 10 days in jail and a $50 fine. There the court held that, in view of the punishment authorized and adjudged, the contemnors had no federal constitutional right to a jury trial. After discussing *Bloom* and *Duncan* briefly, both of which were handed down on the same day as *Dyke,* the court stated that it still had not stated "precisely where the line falls between punishments that can be considered 'petty' and those that cannot be." *Id.,* 391 U.S. 220 [88 S.Ct. 1474–1475], 20 L.Ed.2d 542. Nevertheless, the court said that, "it is clear that a six-month sentence is short enough to be 'petty'," on the basis of *Cheff v. Schnackenberg,* 384 U.S. 373, [86 S.Ct. 1523], 16 L.Ed.2d 629 (1966).
A later case, *Muniz v. Hoffman,* 422 U.S. 454, 95 S.Ct. 2178, 45 L.Ed.2d 319 (1975), held that a $10,000 fine imposed on a union adjudged guilty of indirect criminal contempt for violating temporary injunctions did not necessarily make the case a "serious" one giving the union a right to trial by jury. Noting that the union involved collected dues from some 13,000 members, the court said:
"... we cannot accept the proposition that a contempt must be considered a serious crime

under all circumstances where the punishment is a fine of more than $500, unaccompanied by imprisonment. It is one thing to hold that deprivation of an individual's liberty beyond a six-month term should not be imposed without the protections of a jury trial, but it is quite another to suggest that, regardless of the circumstances, a jury is required where any fine greater than $500 is contemplated. From the standpoint of determining the seriousness of the risk and the extent of the possible deprivation faced by a contemnor, imprisonment and fines are intrinsically different. It is not difficult to grasp the proposition that six months in jail is a serious matter for any individual, but it is not tenable to argue that the possibility of a $501 fine would be considered a serious risk to a large corporation or labor union."
*Id.,* 422 U.S. 477, 95 S.Ct. 2190–2191, 45 L.Ed.2d 335. Such position is consistent with the view that a fine levied for criminal contempt is punitive and not a means of aiding a litigant, as may be the case in civil contempt. Cf. *Mechanic v. Gruensfelder,* 461 S.W.2d 298, 304–305 (Mo.App.1970); *Chemical Fireproofing Corporation v. Bronska,* 553 S.W.2d 710, 715 (Mo.App.1977). An amount that might be a grave punishment in terms of a fine to one contemnor may be a matter of inconsequential impact to another. What the Eighth Circuit said of the fines in *Girard v. Goins,* 575 F.2d 160, 165 (1978) is not inconsistent with this view:
"While we are unwilling to establish the principle in this Circuit that any fine assessed against an individual in excess of $500 is of such magnitude to constitute a serious offense, we have no difficulty in holding on the basis of this record that fines ranging from $2,500 to $10,000 assessed against the individual petitioners do indeed constitute a serious offense."
What we may distill from all of the foregoing is that: imprisonment of an individual for a term in excess of six months for one act of criminal contempt always imparts seriousness to the matter so as to activate the right to trial by jury; a fine in excess of $500 may or may not make the matter "serious," depending on the resources of the contemnor; a fine of $500 or less, without imprisonment, is always a "petty" matter.

as separate punishments of petty offenses, the court carefully distinguished the situation presented in the case before it from two companion cases advanced by the unions: *United States v. Seale,* 461 F.2d 345 (7th Cir.1972) and *In Re Dellinger,* 461 F.2d 389 (7th Cir.1972). Like *Codispoti,* both *Seale* and *Dellinger* involved repeated, tumultuous and disrespectful activities of contemnors during the course of criminal trials. Also like *Codispoti,* the trial judge in *Seale* and *Dellinger* waited until the conclusion of the trials to mete out sentences for acts of direct criminal contempt which was done summarily and, as to most of the contemnors, resulted in sentences aggregating more than six months.

In *Guild Local 225,* the court declined to extend "the *Seale* aggregation rule" to cases of indirect criminal contempt, "absent exceptional circumstances." *Id.,* 476 F.2d 859–860. We find the reasons for such holding to be particularly cogent and persuasive here. The court first noted that in *Seale* (as was true in the later case of *Codispoti* ):

> "... the trial judge had been subjected to personal insults and villification of a kind highly likely to strike 'at the most vulnerable and human qualities of a judge's temperament.' *Bloom v. Illinois, supra,* 391 U.S. at 202, 88 S.Ct. at 1482. The appellate court's consequent concern that a unitary course of contemptuous conduct might be 'spread out' in order to punish a serious offense summarily may be best understood in light of these circumstances. The possibility of such abuse, however, is greatly reduced where, as here, the contumacious behavior involved is the violation of a court injunction rather than a direct contempt. Such conduct, while in disobedience of the court's authority, does not involve the kind of affront to a trial judge likely to cause an identification of 'offense to self with obstruction to law.' *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11, 16 (1954). Thus, since there is no particular need to be wary of the trial court's detachment and judicial objectivity in the type of case before us, we think that appellate review of the original discreteness determination will adequately protect the rights of defendants not to receive 'serious' sentences for criminal contempts without the benefit of a jury trial."

*Id.,* 476 F.2d 858–859 (footnote omitted). As indicated above, we have determined that each of the violations was treated as a separate matter. Furthermore, our examination of the record reveals not the slightest indication of anything but a most commendable display of judicial detachment and objectivity on the part of the Circuit Judge.

Since none of the sentences imposed on petitioners exceeded six months for any of the violations and since, as we have discussed, the "discreteness test" has been passed, the acts of indirect contempt are petty offenses. Therefore, the right to trial by jury did not attach; and the Circuit Court was not bound to solicit affirmative waivers of such right from the petitioners.

Petitioners' second point is two-pronged: (a) that the judgments of conviction and commitment orders fail to state the facts essential to criminal contempt; and, (b) the evidence at trial precludes any finding of "careless and imprudent disregard for the power and authority of the court."

■ The first thrust of this argument is predicated upon the assertion that the judgments and orders of commitment do not contain findings that the petitioner named in each "acted with '... careless and imprudent disregard for the power and authority of the court.'" It is petitioners' argument that such a finding is a necessary element of criminal contempt and that its absence renders the judgments null and void. Such argument is premised upon the difference between the proof of intent necessary in civil contempt and that needed to make a case of criminal contempt, as discussed in *Chemical Fireproofing Corporation v. Bronska,* 553 S.W.2d 710, 717 (Mo. App.1977).

We are of the opinion that *Chemical Fireproofing* is of no help to petitioners whatso-

ever. In that case, this Court acknowledged that proof of intent in a criminal contempt case requires something more than mere intent to commit an act prohibited by court order (which is sufficient for civil contempt), but that intent to defy the court (as an element of criminal contempt) would be virtually impossible to prove. Consequently, this Court settled on a middle ground as the requisite for proof of intent in criminal contempt: intent to harm the other party by doing an act violative of the court's order with careless and imprudent disregard for the authority of the court to issue the order. Measured against this standard, we hold that the detailed findings of fact entered in each case fully warranted the conclusions of law entered in each: that the acts of each petitioner in each instance "were willful, deliberate and knowing violations of the Order for Permanent Injunction issued by this Court with actual knowledge of the Court Order of November 10, 1980, and by reason thereof he has committed indirect criminal contempt of this Court."

The judgments and orders of commitment met, in all respects, the mandate of Rule 36.01 and § 476.140, RSMo 1978, that they recite the essential facts constituting the criminal contempt, i.e., the existence and terms of the injunction, knowledge of those terms on the part of each petitioner, and the specific act of each petitioner on each occasion constituting a violation of the injunction.[4] Inherent in each set of facts so found was the element of "careless and imprudent disregard for the power and authority of the court ..." *Chemical Fireproofing,* supra, or put another way—contumacy.

The second prong of petitioners' argument on this point is that a finding of "careless and imprudent disregard" of the Circuit Court's authority here was precluded by the evidence at the trial. This because, as they say in their brief, "Petitioner Lee testified that when he and the other Petitioners went to the Ladies Center on the dates discussed herein, they had no intention of being disrespectful to the Court nor to the Order for Permanent Injunction that the Court had entered."[5] In rejecting this argument, as the Circuit Court obviously did, we need not rely solely on the familiar precept of the criminal law that a person is presumed to intend the natural and probable consequences of his intentional acts and may not excuse those consequences by claiming he had a mental reservation. *State v. Mannon,* 637 S.W.2d 674, 678 (Mo. banc 1982); *State v. Shuler,* 486 S.W.2d 505, 509 (Mo.1972). Our examination of the transcript and the photographic exhibits persuades us that the Circuit Court properly looked to what was done rather than what was self-servingly uttered later from the witness stand. The testimony was clear and unchallenged that, throughout the period during which the violations occurred, petitioners were continually reminded of the terms of the injunction by police and others; at various times during the period, some or all of them were formally served with orders to show cause why they should not be adjudged guilty of contempt. Yet, as the testimony reveals, they continued to return to the premises, block the entrance and interfere with ingress of persons wishing to enter the Ladies Center.[6] Pious

4. A typical example of a finding of a specific act in violation of the injunction is that relating to petitioner Ryan: "On September 18, 1982, Defendant Ryan did stand in front of the entry door to the Ladies Center of St. Louis, Inc. ("Ladies Center") at 8448 Delmar Boulevard, University City, Missouri, and did thereby block such door and prevent the entry of a person who expressed her wish to enter the Ladies Center. Ryan so acted with the intent to disrupt and interfere with the operation of the business of the Ladies Center."

5. Lee was the only one of the petitioners who testified.

6. On one occasion, October 9, 1982, after the petitioners had been arrested at the Center and were being booked at the University City Police Station, they engaged in a conversation to the effect that they might not be able to return to the Center the following week because they might be in jail for violation of the injunction. As of the date of the conversation, a hearing on then pending contempt charges against them was set for October 14, 1982. That hearing was continued, and all four petitioners were

protestations that petitioners meant no disrespect for judicial authority ring hollow when contradicted by photographs showing petitioners being dragged by police from the very door on which was posted a copy of the injunction addressed to each of them by name. Such stubborn repetition of contemptuous acts in the face of repeated warnings constitutes a special element of contumacy. Cf. *Chemical Fireproofing*, supra, 553 S.W.2d 716.

We have examined the record thoroughly, and we are satisfied that petitioners were accorded all rights due them under the Constitution of the United States, the Constitution of Missouri, and the laws of this State. In this case, the petitioners freely and knowingly elected to challenge the authority of our system of justice. We have no doubt that the petitioners' acts in disobedience of the injunction were impelled by what petitioners perceive as the loftiest of motives, protection of the unborn. We cannot and do not, however, consider their motivation, only their methods. And their methods cannot be condoned or the rule of law would be imperiled, as discussed in more detail in the Concurring Opinion.

The writs of habeas corpus issued in response to the petitions filed herein are quashed. Petitioners are remanded to the custody of respondent, in accordance with the commitment orders of the Circuit Court.

DOWD, J., concurs.

GAERTNER, J., concurs and files separate concurring opinion.

GAERTNER, Judge, concurring.

Domestic tranquility, as envisioned by the authors of the Constitution of the United States, cannot be maintained if the courts, which exist for the purpose of maintaining order in our society, can be defied with impunity. Therefore, the only issues to which this court may address its attention in this matter are the effect upon an ordered society and the necessary legal consequences of open, notorious and repeated

back at the Center on October 16, 1982, to

defiance of judicial authority. We look not to the morality or immorality of abortions, nor to the motivation, even though it may arise to the level of a moral imperative, of the petitioners. Defiance of court orders cannot be overlooked or disregarded without a concomitant erosion of social order leading to eventual anarchy. The disavowal by petitioners herein of intent to demonstrate contempt for the court's order must be viewed in the context of the potential effects of their actions upon the preservation of harmony in a society governed by the rule of law.

Civil disobedience is recognized by some moralists and theologians as a concept which would morally, although not legally, justify conduct, non-injurious to the rights of others, in violation of existing civil law for the purpose of creating such a surge of public opinion as to cause a change in the law. Inherent in this concept are two preconditions of which petitioners herein should be aware—first, the exhaustion of all possibility of effecting a change in law through lawful, political means; second, a willingness to accept the legal consequences of one's actions. Indeed, some practitioners of civil disobedience have viewed these consequences—imprisonment and even, in historic times, execution—as a means of focusing public attention upon the justness of their cause.

We are blessed in this nation because the right to persuade others of the rightness of our ideas is virtually unfettered. The right to impose them is not. Nor do we possess rights to intrude upon the practice by others of what they believe. And lest this permitted diversity lead to chaos, the rule of law as enunciated by the courts must always be obeyed.

I concur.