**MARYLAND CASUALTY COMPANY,**
**Plaintiff-Respondent,**

v.

**Bernard C. HUGER, Defendant ad litem for Rev. James J. Danis,**

**Jon Arthur and Donna Sue Becker,**
**Defendants-Appellants.**

**No. 51314.**

Missouri Court of Appeals,
Eastern District,
Division Five.

March 3, 1987.

Motion for Rehearing and/or Transfer
Denied April 1, 1987.

Application to Transfer Denied
May 19, 1987.

Ben N. Messina, St. Louis, for defendants-appellants.

Gary Edward Snodgrass, St. Louis, for plaintiff-respondent.

SIMEONE, Senior Judge.

## I

This is an appeal by defendants-appellants, Jon and Donna Sue Becker, from an order and judgment of the circuit court of the City of St. Louis entered January 29, 1986, upon a petition for declaratory judgment. Plaintiff sought a determination of its rights under a general liability policy. The trial court decreed that: (1) there is no coverage under the plaintiff's liability insurance policy for Bernard C. Huger, defendant ad litem for Reverend James J. Danis, a late Roman Catholic priest of the Archdiocese of St. Louis for his activities at an abortion clinic which resulted in injuries to Lieutenant Jon Becker, (2) that the plaintiff has no obligation to pay any judgment that may be rendered against the defendant ad litem, and (3) that the company has no duty to defend Huger in a civil cause filed against him by Jon and Donna Sue Becker. For reversal appellants contend that, under the standards of *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976), the trial court erred in several respects. For reasons hereinafter stated, we affirm.

## II

This case deals with a bizzare twist to the emotionally charged, socio-political issue of abortion recognized in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

The core issue in this appeal is the legal and proper interpretation of specific provisions embodied in a general liability insurance policy issued by Maryland Casualty Company to the Archdiocese of St. Louis. This policy provided coverage to "the Archbishop of St. Louis and His successors in their individual capacities and all the Priests, Sisters and Lay Brothers and Religious of the Archdiocese of St. Louis [while] acting within the scope of their respective duties."

The policy became effective April 1, 1979 and was in effect on March 8, 1980, when Father Danis engaged in the acts which are the subject of this proceeding. There are other subsidiary points raised by appellants, but a resolution of this issue—the nucleus of the appeal—will effectively dispose of these satellite points.

This case involves only the personal liability coverage of Father Danis and the defendant ad litem for Father Danis.[1] The appeal does not involve any issue of liability coverage for the Archdiocese.

We hold that the trial court did not err in concluding that Father Danis, while engaged in unlawful protest at an abortion clinic which resulted in injury to Lt. Becker, was not "acting within the scope of his respective duties" so as to be a named insured under the policy. The trial court, under the facts and circumstances, could reasonably arrive at that conclusion because there was substantial evidence to that effect, the conclusion was not against the weight of the evidence, and the court did not erroneously declare or misapply the law. *Murphy v. Carron, supra.*

### III

On April 1, 1979, Maryland Casualty Company issued to the Archdiocese of St. Louis and certain other named insureds a general liability policy providing comprehensive general liability insurance for bodily injury and property damage liability.

The policy was in effect on March 8, 1980 when the events giving rise to this litigation occurred. On that date, Lieutenant Jon Arthur Becker, of the St. Louis County Police, was assigned to the Regency Park Gynecological Center on Manchester Road "to preserve the peace during a demonstration." There were other police officers with him, including Captain Mizell. Lt. Becker observed people "walking about outside on Manchester Road and along the roadway." "They were walking with different signs and slogans on them." There were also "people inside of the building

milling about, walking about in the hallways ... some of them ... had signs." Lt. Becker observed Father Danis there, in his Roman collar, walking back and forth in a hallway. He also saw "Father Danis counseling women trying to get into the doctor's office," and overheard him telling a young girl that there were other alternatives—"[T]he church is against it. It is a sin. It is a crime. We can take care of you."

At about 9:30, the individuals "began to block the ingress and egress of this doctor's office, by standing in front of the doorway or standing there locking arms or by seating themselves in front of the doorway." The manager then requested assistance from the police, and the police officers started arresting people for "trespassing." Father Danis continued to walk back and forth talking to people. When he "stood in front of one of the doors," and Lt. Becker placed his hands upon Father Danis's arm and said "Let's go, Father." About five seconds later, Father Danis "went limp, fell directly to the floor" and "as he was going down, I thought someone had stabbed me in the back." Lt. Becker got up and Father Danis "looked up and said, 'I'm not going to make it easy. You'll have to carry me out." Other officers, then did carry Father Danis out. Lt. Becker subsequently learned he had suffered a herniated disk.

Subsequent to these events, Lt. Becker and his wife filed an action in St. Louis County for damages for personal injuries and loss of consortium against the Archdiocese of St. Louis and defendant ad litem for Father Danis. The wife sought damages for loss of consortium. Counts I and II were against the Archdiocese, and Counts III and IV were against Father Danis.

On February 14, 1983, pending the Beckers' suit, the plaintiff filed its "Petition For Declaratory Judgment." A hearing was held on January 13 and 14, 1986, at which several witnesses testified. The principal witnesses were John Joseph Cardinal Car-

---

1. There was also a "Clergyman's Floater" certificate issued by the Company to Father Danis, but that certificate did not cover liability. The trial court expressly found that there was no coverage provided under either the General Liability Policy or the "Clergyman's Floater."

berry and Archbishop John L. May, the Archbishop of St. Louis.

Archbishop May, who became Archbishop a few weeks after the March 8, 1980 incident, testified in the plaintiff's case that he is familiar with the policies of the Roman Catholic Church and with the "policies" of the Church with respect to abortion. On that issue, the "teaching" of the Church is uniform throughout the world, and that "abortion is immoral." As to "speaking out" on abortion, the Archbishop stated that "everyone has a right to speak out," but as to any "policy" on picketing, there "is no policy all over the country with regard to that. That's a simple legal right that any citizen can exercise at any time. If he does it legally."

As to the duties of a priest, the Archbishop stated that "a priest is a pastor; he preaches the word of God. He gives spiritual direction. He conducts the liturgy. He does those things that are pastoral." When questioned about the "duty of a priest in the Archdiocese," concerning protesting abortions at abortion clinics, the Archbishop stated "there's no such duty prescribed of any priest." Neither was it a priest's duty to "trespass unlawfully on property to express opposition to abortion." It is and was, however, a priest's duty "to follow the law."

On cross-examination, Archbishop May admitted that as the "Ordinary," he is bound by canon law, and "bound" by certain post-Vatican II documents. He was questioned about plaintiff's exhibit, a post-conciliar document Quaestio de Abortu, dated November 18, 1974,[2] which is one of the documents setting forth Catholic doctrine on the issue of abortion. That document sets forth the Church's position and doctrine.

He was also questioned about the document, "Presbyterorum Ordinis"[3] which deals with the life and ministry of priests. As to these documents, Archbishop May explained that they set an ideal, or a "direction for priests to live their lives [but] it's not a law." These documents are the teachings of the Church; and a priest can "teach anywhere he wishes," but the "most appropriate place is in the pulpit." "There are places appropriate and places not appropriate." "A priest is one 'at all times.'"

The evidence shows that in the Archdiocese, there is an Archdiocesan Pro-Life Committee, and a "director", or "coordinator." This Committee was established under the auspices of Cardinal Carberry. The purpose of the Committee is to defend "human life,"—and to be against abortion, child abuse and euthanasia. The Committee was established soon after the Supreme Court decision. It was "involved" with the "Missouri Citizens for Life," a nondenominational state-wide group, which engages in peaceful picketing.[4]

**2.** "Declaration on Procured Abortion" published by the Sacred Congregation for the Doctrine of the Faith, 2 Vatican Collection, edited by Austin Flannery, O.P. at p. 441, translated and published by the Vatican Press Office. Latin original in AAS 66 (1974) 730–747.

That document states, in part, that "the first right of a human person is his life." "Most recently, the Second Vatican Council has most severely condemned abortion: 'Life must be safeguarded with extreme care from conception; abortion and infanticide are abominable crimes.'"

See also the Encyclical Letter of Pope Paul II "Humanae Vitae." That document states in part that "'Human life is sacred—all men must recognize that fact,' Our Predecessor Pope John XXIII recalled, 'from its very inception it betrays the creating hand of God.'" ... We are obliged once more to declare that ... direct abortion, even for therapeutic reasons, [is] to be absolutely excluded as lawful means of control-

ling the birth of children.".... "[N]ot everyone perhaps will easily accept this particular teaching.... [But] She [the Church] does not, because of this, evade the duty imposed of proclaiming humbly but firmly the entire moral law, both natural and evangelical."

**3.** "Decree on the Ministry and Life of Priests," 2 *Vatican Collection, The Conciliar and Post Conciliar Documents,* (A. Flannery, O.P.1965) at 863.

**4.** One of the exhibits introduced by defendants was the Pro-Life Committee minutes. Those state, relative to "Picketing" that "Missouri Citizens For Life sponsors an ongoing program of picketing the Reproductive Health Services ... as well as other abortion clinics. Many of the volunteers ... are parishioners who are recruited by Parish Pro-Life Committees ... The picketing at the abortion clinics is done in a spirit of Christian involvement. Signs may be carried if they are of a positive nature ... The purpose of

When asked hypothetically, whether a priest who protests at an abortion clinic and blocks an entranceway to prevent people from going in, and refuses to leave so that he is placed under arrest, is acting "within the scope of his duties," Archbishop May answered "Certainly he's not obliged to do those actions. He's not directed to do them in any of his responsibilities as a priest. He does that simply by his own personal judgment."

The Archbishop's testimony, given in deposition, can be summarized:

When a priest goes anywhere, he's acting as a priest ... What he says, he says as a representative, a public representative of the Catholic Church. Now, he's free within those parameters to choose one way of expressing himself ... some do it ... through books, through formal speeches, through panel discussions, on talk shows, on the radio. Others think they can make a statement by public demonstration. Each man is free. These are professional men, and they're just not puppets on a string that are told what to do in everything they do. They are free to express themselves; and as long as they do it as responsible, professional people and teach what the church teaches, ... the church has confidence in them, entrusts their good judgment.

In the defendants' case, John Joseph Cardinal Carberry testified. He was present at Vatican II. He was questioned about the documents Quaestio de Abortu, and the Decree on the Ministry of Priests. The document on abortion was not promulgated during the Vatican Council, but published "following the abortion decision." It was issued by the Congregation with the approval of the Holy Father. The Cardinal acknowledged that the statement in the document—"the first right of the human person is his life"—is part of the "moral teachings" of the Church and the "Word of God." He also recognized that a task of priests is to preach the Gospel and the "sanctity of life" is a part of that "morali-

ty." The Cardinal also stated that "it would be following out the teachings of the Vatican Council" to lawfully counsel women against abortion at such clinics. When questioned whether peaceful picketing by priests at an abortion clinic would fall within the purview of these Vatican documents, he responded "I don't think it would fall within the purview of the documents."

Certain other witnesses, including the brother of Father Danis, testified.

Following the evidentiary hearing, the trial court made its findings of fact, conclusions of law and entered its judgment. The court concluded that Father Danis was not a named insured under the liability policy because he was not acting "within the scope of his respective duties."

**IV**

On appeal, defendants' principal contention is that under the documents and official teachings of the Church, its official position on the issue of abortion, and the establishment of anti-abortion committees by the Archdiocese, Father Danis was within the "scope of his duties" and that such Church policies covered his activities at the abortion clinic. More specifically they argue that as Father Danis was a priest he had a right and duty to counsel women on abortion; to "teach" and counsel anywhere, anytime and that he was therefore within the scope of his duties and a named insured under the policy.

The resolution of this appeal involves the principles of both the proper interpretation and construction of insurance contracts and those relating analogously to respondeat superior.

Our function is not to rewrite an insurance contract. It is our duty to interpret and enforce it as written. *Brugioni v. Maryland Casualty Company*, 382 S.W.2d 707 (Mo.1964). We only construe the contract as written. *Central Surety & Ins. Corp. v. New Amsterdam Cas. Co.*, 359 Mo. 430, 222 S.W.2d 76, 80 (Mo. banc 1949).

the project is not to blame or harass, but rather to educate and reach out in a loving way to

those implicated in abortion."

The court cannot construe the policy to afford coverage where it does not exist, and words must be given their plain and ordinary meaning. *American Ins. Co. v. First Nat. Bank in St. Louis,* 409 F.2d 1387, 1390 (8th Cir.1969); 25 Mo.Dig.2d, Insurance, Key No. 146.1. The phrase in the policy "within the scope of their respective duties" is nowhere defined, so it becomes our duty to ascertain its meaning within the context and circumstances of this case. Whether Reverend Danis's actions at the clinic fall within the parameters of the phrase is a question of fact. See *Jordan v. Robert Half Personnel, Etc.,* 615 S.W.2d 574, 582 (Mo.App.1981).

■ The law of agency can be used to analogize whether Father Danis was acting within the scope of his respective duties when engaged in the activities of protesting against abortion at the clinic. The general principles relating to "principal and agent" or "employer and employee" have often been stated and are easily enunciated, but application to specific factual situations taxes the minds of jurors, lawyers and judges. See O.W. Holmes, *The History of Agency,* 3 Select Essays in Anglo American History 368 (1909). The application of the principles depends upon the facts and circumstances in each particular case and no single test is conclusive. *Sharp v. W. & W. Trucking Co.,* 421 S.W.2d 213, 220 (Mo. banc 1967). The principles have been stated in various ways and contain many refinements. Whether an act is within the "scope of employment" or "scope of duty" is not measured by the time or motive of the act, but whether it was done by virtue of the employment and in furtherance of the business or interests of the "employer." See generally, Note, *Master and Servant—Scope of Employment—Use of Excessive Violence,* 39 Mo.L. Rev. 626 (1974).

■ Generally, the principle applies when the "employee," in the line of his employment, is actually engaged in and about his employer's business and is carrying out his purposes. The general principle is stated by Professor Mechem:

The utmost that can ordinarily be said is that an [employee] is acting in the course of his employment when he is engaged in doing for his [employer] either an act consciously and specifically directed or any act which can fairly and reasonably be deemed to be an ordinary and natural incident or attribute of that act, or a natural, direct and logical result of it. If in doing such an act, the [employee] acts [wrongly] that is within the course of employment. 2 Mechem, *Agency,* § 1879 at 1461 (1914).

■ Under this doctrine, a principal or employer is held liable to a third person for a tort, even though not directed or commanded nor expressly authorized by the employer, provided that the employee or agent has committed such act while engaged in an activity falling within the scope of his authority or employment. *Bass v. Kansas City Journal Post Co.,* 347 Mo. 681, 148 S.W.2d 548, 551 (1941); *Haehl v. Wabash R. Co.,* 119 Mo. 325, 24 S.W. 737, 740 (1893); ovrl'd as to certain language in *Wellman v. Pacer Oil Co.,* 504 S.W.2d 55 (Mo.1973).

In *Bova v. St. Louis Public Service Company,* 316 S.W.2d 140 (Mo.App.1958), this court, in quoting with approval, *Maniaci v. Interurban Express Co.,* 266 Mo. 633, 182 S.W. 981 (1916), stated that an act is within the course of employment if (1) it is something fairly and naturally incident to the business and (2), although mistakenly or ill advisedly done, it is done while engaged in the master's business, and did not arise wholly from some external, independent or personal motive to do the act upon his own account.

■ The Missouri Approved Instructions, 13.02 defines the phrase "scope and course of employment" as acts (1) which, even though not specifically authorized, are done to further the business or interests of the employer under his "general authority and direction" and (2) which naturally arise from the performance of the employer's work. MAI 3d 13.02 (1981). The second requirement of MAI 3d 13.02, by its use of the word "naturally," implies that the employees' conduct must be usual, customary

580

and expected. This amounts to a requirement of foreseeability. *See supra*, Note 39 Mo.L.Rev. at 630.

The Restatement (Second) of Agency § 228 (1957) provides (1) that when force is used the conduct of an employee is within the scope of employment, only if the force is expectable by the master and (2) conduct is not within the scope if it is different in kind from that authorized or far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

Section 229 of the Restatement (Second) discusses the kind of conduct which is within the scope of employment. To be within the scope of employment the conduct must be of the same general nature as that authorized or incidental to the authorized conduct. In determining whether or not the conduct is incidental to the authorized conduct, the following matters, *inter alia* are to be considered: (1) whether or not the act is one commonly done, (2) the time, place and purpose of the act, and (3) whether or not the master has reason to expect such an act to be done.

■ The fact that an act was done during the time of employment is not conclusive. Neither is the motive of the employee. *See Smothers v. Welch & Co. House Furnishing Co.*, 310 Mo. 144, 274 S.W. 678, 679 (1925).

These principles are recognized in the Missouri decisions. *Hern v. Heckert*, 679 S.W.2d 322 (Mo.App.1984); *Henderson v. Laclede Radio, Inc.*, 506 S.W.2d 434 (Mo. 1974); *Mansfield v. Smithie*, 615 S.W.2d 649 (Mo.App.1981)—excellent discussion.

The Missouri Supreme Court adopted § 231, Comment (a) of the Restatement (Second) of Agency in *Wellman v. Pacer Oil Co.*, 504 S.W.2d 55, 58 (Mo. banc 1973).

It states that "the master is not responsible for acts which are clearly inappropriate to or unforeseeable in the accomplishment of the authorized result." Restatement (Second) of Agency, § 231 Comment (a) (1957). The rationale behind that section is that if an act is not appropriate or expected, it can be neither authorized nor incidental to an authorized act. See, Restatement (Second) Agency, § 228–29, 235, 245 (1957); see *supra*, Note, 39 Mo.L.Rev. 626, 629 n. 27. In *Pacer Oil*, our Supreme Court held that an employer was not responsible for the personal act of a gas station attendant who injured a customer.

■ Tested by these legal principles, while Father Danis was a sincere Roman Catholic priest, who strongly believed in the principles of his Church and had a strong desire to carry out and give witness to those principles, his actions on March 8, 1980 do not fall within the "scope of his duties."

His activities were not within the direction of his superiors or the Church. Moreover, they were neither authorized, usual, customary, incidental, foreseeable, nor fairly and naturally incidental to his duties. As Archbishop May indicated, the Vatican II documents introduced are goals and guidelines, but nowhere do they indicate that the teachings contained therein are to be carried out in an inappropriate place, time or context, or inside a clinic, or in violation of the civil law. Counseling on the "immorality" of abortion and urging persons to respect life, at all stages, should be done at appropriate places and times.

There is nothing either in the Vatican II documents offered in evidence, nor in the directions or authorizations of the Archbishop, nor in the directions of Father Danis's pastor, nor in the literature of the Pro-Life Committee, nor under canon law [5]

---

**5.** Several provisions of The *Codex Iuris Canonici* [Code of Canon Law] promulgated in 1983 are applicable to the case at bar. Chapter III, Can. 273–289 deal with "The Obligations and Rights of Clerics." These are not "simple recommendations but binding juridic norms that have validity for the whole Church." Coriden, Green, Heintschel, *The Code of Canon Law, A Text and Commentary*, 198 (Paulist Press, 1985). Canon 287 provides in Section 1 that "Most especially, clerics are always to foster that peace and harmony based on justice which is to be observed among all persons." This canon is partly based on Canon 141 of the 1917 Code, which forbade clerics to participate in any way whatever in civil conflict or public disturbances. Coriden, *supra*, at 227. Canon 285 provides that "clerics are to refrain completely from all those things

to indicate that it is or was a priest's duty to engage in such activities.

Both Cardinal Carberry and Archbishop May acknowledged that a priest should be philosophically and theologically opposed to abortion; but, there is no duty to express one's views by way of unlawful demonstrations.

Both Cardinal Carberry and Archbishop May agreed that a priest, as an individual has a privilege to lawfully picket against abortion, but also stated that a priest has an obligation to uphold civil law and to cooperate with civil authorities.[6]

The deposition testimony of Monsignor Michalski, the pastor of St. Cecelia's Parish and Father Danis's immediate superior, confirmed that Father Danis was under no direction or order from Monsignor Michalski or any other member of the Archdiocese to lawfully or unlawfully protest against abortion.

Even though Cardinal Carberry authorized the establishment of an archdiocese pro-life committee which established standards for strategies, including picketing, there was nothing to indicate any authorization, direction or strategy which would include unlawful actions or unlawful picketing.

We must, therefore conclude that under the circumstances here Father Danis was exercising his privilege as a "citizen," albeit with the concomitant consequences,[7] but was not engaged "within the scope of his duties" within the meaning of the contract of insurance.

## V

Appellants discuss several authorities to support the proposition that Father Danis was within the scope of his duties. The decisions relied upon do not resolve the specific issues herein. The decisions relied upon are inapposite. *Porter v. Thompson*, 357 Mo. 31, 206 S.W.2d 509 (1947)—no submissible case when railroad policeman shot plaintiff's husband out of jealousy; *Henderson v. Laclede Radio, Inc.*, 506 S.W.2d 434 (Mo.1974)—employer not liable when salesman made unprovoked attack on plaintiff; *Wagstaff v. City of Maplewood*, 615 S.W.2d 608 (Mo.App.1981)—policeman's actions of negligence within scope of duties as a policeman; *Linam v. Murphy*, 360 Mo. 1140, 232 S.W.2d 937 (1950)—acts of flying instructor flying dual control plane with student pilot "buzzing" town did not absolve employer since employee's act was part of his *duties*. That is not the situation here.

Appellants attempt to establish that Father Danis was acting within the scope of his respective duties by contending that a priest is a priest 24 hours a day. Stated another way, appellants are apparently taking the position that since Father Danis was a priest, any and all activities which he performed took on a priestly character, and therefore, were part of the duties as a priest.

A similar argument was made in *Thompson v. St. Joseph Country Club*, 632 S.W.2d 6 (Mo.App.1982). In that case a country club manager had a contract of employment requiring that his entire time

which are unbecoming to their state"; "clerics are to avoid those things which, although not unbecoming, are nevertheless alien to the clerical state." Coriden, *supra* Comments at 221. See Coriden, *The Code of Canon Law, A Text and Commentary* (1985).

**6.** See St. Thomas Aquinas, *Summa Theologiae*, I–II, Q 96, art. 4: "whether human law binds a man in conscience? ... On the other hand, laws may be unjust in two ways: first, on being contrary to human good ... either in respect of the end, ... or in respect of the form ... A law that is not just, seems to be no law at all. Wherefore, such laws do not bind in conscience, except perhaps, in order to avoid scandal or disturbance for which cause a man should even yield his right. Basic Writings of Saint Thomas

Aquinas, edited by Anton C. Pegis, New York, Random House, 1945.

**7.** See Judge C. Gaertner's concurring opinion in *Ryan v. Moreland*, 653 S.W.2d 244, 254 (Mo. App.1983). "Inherent in this concept [civil disobedience] are two preconditions ... first, the exhaustion of all possibility of effecting a change in law through lawful, political means; second, a willingness to accept the legal consequences of one's actions." *Id.*

See also the statement by Rev. M.L. King, Jr.— "One who breaks an unjust law must do so openly, lovingly, and with a willingness to accept the penalty." Letter From the Birmingham Jail, Goldwin (Ed.), *Civil Disobedience* (1969).

be devoted to his employer's business. The plaintiff argued that the country club manager was acting for the country club when he was involved in an accident on July 4, since his contract required him to devote his entire time to the country club business. In ruling against the plaintiff, the court found that such a contract did not make the employer responsible for all of the employee's activities during every hour of every day and it did not prevent normal rest, recreation and personal activities free of the employer's control. Similarly, the fact that Father Danis was a priest 24 hours a day does not make the Archdiocese responsible for all his activities, and does not make any and all of his activities the actions of a priest within the scope of his respective duties.

■ Appellants also contend that since the Catholic Church has a theological position against abortion and teaches that abortion is immoral and is a crime, that any action by any priest in furtherance of pro-life is within the scope of his respective duties. The testimony supports the proposition that the Church is against abortion. However, there is no evidence which supports the proposition that any and all activities by a priest against abortion are part of a priest's duties.

## VI

The appellants have raised two other contentions. One relates to the interpretation and meaning of "occurrence" as that term is defined in the policy. The other relates to the application of Provision P. Because of the disposition we make, there is no necessity to examine these issues in detail. As to the first contention on the meaning of "intended" or "expected," see *Hanover Ins. Co. v. Newcomer*, 585 S.W.2d 285 (Mo. App.1979). As to the second, the parties have conceded that Provision P is inapplicable in that none of the enumerated offenses were committed.

## VII

Abortion is an emotionally charged issue which produces and engenders strong feelings on both sides of the social, political and philosophical picture. Each side, including Father Danis's, is entitled to express personal views in a peaceful, legal, lawful and temperate manner consistent with and within the confines of the Constitution—that dear document which recognizes our unalienable rights, protects our freedoms, and guarantees us all ordered liberty. Although constitutional rights are protected, however, we cannot conclude that the activities of Father Danis in these circumstances fall within the "scope of his respective duties." Although conflicts between church doctrine and the civil law may sometimes arise, none of the official documents offered in evidence authorize or direct unlawful violations of the civil law. In this country, there is sufficient free reign to teach, persuade, counsel and attempt to achieve change.

In conclusion, we hold the trial court did not err; that the general liability policy issued by plaintiff did not cover the activities of Father Danis; that Father Danis was not a named insured under the policy; and that Father Danis was not "acting within the scope of his respective duties" as a priest of the Archdiocese.

The judgment in all respects is affirmed.

SNYDER, C.J., and CARL R. GAERTNER, J., concur.